SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | Arizona Supreme Court |
| | ) | No. CR-04-0098-AP |
| Appellee, | ) | |
| | ) | Maricopa County |
| v. | ) | Superior Court |
| | ) | No. CR2001-011704 |
| DAVID LAMAR ANTHONY, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | **O P I N I O N** |
| _____ | ) | |

Appeal from the Superior Court in Maricopa County
The Honorable Frank T. Galati, Judge

**REVERSED AND REMANDED**
_____

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                Phoenix
     By  Kent E. Cattani, Chief Counsel
         Capital Litigation Section
         Amy Pignatella Cain, Assistant Attorney General  Tucson
Attorneys for the State of Arizona

JAMES J. HAAS, MARICOPA COUNTY PUBLIC DEFENDER         Phoenix
     By  Tennie B. Martin, Deputy Public Defender
         Stephen J. Whelihan, Deputy Public Defender
Attorneys for David Lamar Anthony
_____

**H U R W I T Z**, Justice

¶1      On July 7, 2001, Donna Jean Anthony and her two children failed to arrive in Ohio as planned for a family visit. David Lamar Anthony, Donna's husband, was later charged with murdering the three. Anthony was convicted of three counts of first-degree murder after a jury trial in Maricopa County Superior Court; three death sentences were imposed.

¶2    This is an automatic appeal pursuant to Arizona Rule of Criminal Procedure 31.2(b) from the convictions and sentences. We have jurisdiction under Article 6, Section 5(3) of the Arizona Constitution and A.R.S. § 13-4031 (2001).

## I.

¶3    At the time of trial, the bodies of the victims had not been recovered. Anthony did not admit to the crimes and there were no witnesses to the murders. The State's case was therefore built on circumstantial evidence. We begin by summarizing that evidence.[1]

## A.

¶4    Anthony and Donna were married in 1997. Donna had two minor children from a previous marriage – Danielle Romero, born in 1987, and Richard Romero, born in 1988 – both of whom lived with the Anthonys. The Anthony marriage was troubled almost from the outset. Donna and Anthony frequently argued and the evidence suggests that Anthony was unfaithful. Donna apparently did not trust Anthony in financial matters. In late 2000, the family home was refinanced. Donna instructed the mortgage officer not to release the loan proceeds, approximately

---

[1]    We view the facts in the light most favorable to sustaining the jury's verdict. *See State v. Tucker*, 205 Ariz. 157, 160 n.1, 68 P.3d 110, 113 n.1 (2003).

$105,000, to Anthony. She deposited the check into her personal savings account at Bank One, which Anthony could not access.

¶5    On June 25, 2001, Donna bought plane tickets for her and the children to visit her family in Columbus, Ohio; their flight was to leave Phoenix on July 7. Three days later, someone changed the personal identification number ("PIN") on Donna's Bank One account. Later that week, Anthony arranged to buy a new pickup truck, but delayed closing the purchase until July 7, telling the salesman that he shortly expected to "com[e] into some money." Just before Donna and the children were scheduled to leave town, Anthony arranged for a carpet cleaning service to come to the home on July 9.

**B.**

¶6    At 6:00 p.m. on July 6, Donna came home from work and took a nap. Anthony was also at home. At 6:51 p.m., a call was made from Donna's mobile phone to Bank One; the caller transferred $84,000 – virtually all of the money remaining from the home refinancing – from Donna's account to the Anthonys' joint checking account. This transaction required use of the PIN created on June 28.

¶7    After Donna awoke on July 6, she went to work at a second job at the post office. At 2:18 a.m. on July 7, she clocked out of her shift. At 3:30 a.m., her credit card was used at a gas station between her home and the post office. At

3

5:57 a.m., Donna's mobile phone was used to call Bank One customer service. Shortly thereafter, the voicemail on Donna's mobile phone was called three times. Donna's mobile phone was never used again. Donna, Danielle, and Richard did not board their 7:35 a.m. flight on July 7 from Phoenix to Las Vegas or the connecting flight from Las Vegas to Columbus.

¶8    When Donna and the children failed to arrive in Ohio as scheduled, Donna's family attempted unsuccessfully to contact Anthony. The family then asked law enforcement to investigate. Early the next morning, July 8, a Maricopa County Sheriff's Office ("MCSO") deputy went to the Anthony residence. The deputy told Anthony that Donna and the two children had not arrived in Ohio. Anthony did not seem "overly surprised" and did not ask the deputy to search for them. Later that morning, Anthony finalized his purchase of the pickup truck, writing a $39,147.17 check from the couple's joint account.

¶9    On the evening of July 9, Donna's truck was found in a supermarket parking lot in Phoenix. The doors were unlocked and the keys were in the ignition. There was no sign of forced entry. The vehicle had been recently washed.

¶10    On July 9, Anthony purchased a new mattress; he paid cash and gave the store a false name and address. That same morning, Anthony arranged for house cleaners to come to the residence on the following day. At 11:00 a.m., the previously

4

scheduled carpet cleaners arrived.  One of them helped Anthony remove the old mattress from the master bedroom.

¶11     Anthony told the carpet cleaners that his dog had bled on the office carpet and asked them to clean it.  Anthony said that he had tried to remove the stain and the carpet appeared as if it had been cleaned.

¶12     At 3:41 p.m., an MCSO deputy returned to the Anthony residence.  The carpet appeared to have been cleaned recently, and the house looked "immaculate" with a strong smell of Pinesol.  Anthony told the deputy that he did not want Donna listed as missing because she might get angry if detained by officers responding to such an alert.  That evening, Anthony bought a new clothes washer, clothes dryer, and vacuum cleaner.

¶13     On the morning of July 10, the house cleaners arrived and Anthony instructed them to focus on the baseboards and "the dirty areas on the walls."  One of the cleaners saw Anthony place new pillowcases on the bed in the master bedroom.  The sheets on the bed also appeared to be new.

¶14     On the same day, Anthony wrote a check to himself for $40,000 from the joint checking account.  He deposited the check into a checking account that he shared with his son.

## C.

¶15     Anthony was questioned several times by MCSO officers in connection with the family's disappearance.  He told

detectives that Donna and the children had left for the airport between 5:00 and 5:30 a.m. on July 7. He said Donna customarily carried large amounts of cash and sometimes wore expensive jewelry; he suggested that she may have put herself in danger by driving through the wrong neighborhood. He also speculated that Donna may have driven to the airport, but then decided to drive to Las Vegas. Anthony claimed that "they" had transferred the funds from Donna's account into the joint account; $40,000 was to be used for the new truck and the balance to settle a pending lawsuit with neighbors.[2] He denied any marital problems.

### D.

¶16     From July 17 until July 19, 2001, the MCSO executed a search warrant at the Anthony residence. During the search, carpeting, drywall, and bedding were removed for forensic testing. If blood stains were apparent during the search, MCSO detectives took samples for testing. If no blood stains were visible, the detectives applied Luminol, a chemical that fluoresces when it comes into contact with blood, to suspect areas. When the Luminol test was positive, samples were collected. Because Luminol can give false positives, analysts later ran another test to confirm the presence of blood.

---

[2]     The evidence at trial indicated, however, that a proposed settlement would have required the neighbors to pay the Anthonys, not the other way around.

6

¶17    Detectives found a new mattress in the master bedroom. The bedding in the master bedroom and in Danielle's room was also new. In the trash bins, detectives recovered a two-liter bottle of Pinesol, several pairs of rubber surgical gloves, and two knives. There were traces of blood on both knives, but the blood was too degraded for DNA analysis.

¶18    In the master bedroom, small drops of blood (totaling about the volume of one sugar cube) were found on the wall behind the bed. DNA testing identified some of the blood as Donna's. The DNA of a second person was also found; Anthony could not be excluded as the possible contributor. Carpeting to the right of the bed also tested positive for blood.[3]

¶19    In the home office, three spots on the carpeting several inches in diameter tested positive for blood. The concrete slab underneath the carpet had a visible stain that tested positive for blood. The blood on the concrete slab was Danielle's.

¶20    In Richard's room, the side of the mattress, the side of the box springs, a body pillow, and a wall tested positive for blood. The blood on the mattress and on the body pillow was Richard's. Blood from an unidentified person was also found on

_____

[3]    The detectives found a .38 revolver behind an air vent. The gun had been cleaned, and it could not be determined whether it had recently been used.

7

the side of the mattress; Donna and Danielle could not be excluded as contributors. In the hallway outside the children's rooms, four spots on the wall tested positive for blood. One of the stains contained Richard's DNA, as well as DNA that was consistent with either Donna or Danielle.

¶21 A hamper in the children's bathroom tested positive for blood. Blood was found on the coat closet door, on the threshold of the door leading from the kitchen to the backyard, on the exterior wall just outside the door between the kitchen and the backyard, on the back patio, and on a wooden picnic bench on the patio. Several spots in the garage tested positive for blood.

¶22 The State's expert testified that the volume of blood discovered in the house was too small to prove either that the victims had died or the cause of any death.

¶23 Donna's truck was also subjected to forensic examination. Dried desert vegetation was found on the truck's undercarriage, the interior door handle, and in the driver's door hinge. The vehicle was processed for latent fingerprints, but only five were found. This low number, together with wipe marks all over the truck, suggested that someone had cleaned fingerprints from the vehicle. The driver's door, the interior door panel, the steering column, and the back of the passenger seat tested positive for blood. The bed liner, tailgate liner,

and tailgate also tested positive for blood.  The blood on the tailgate liner was consistent with the DNA of both Donna and Danielle.

## E.

¶24     Anthony was indicted for the first-degree murders of Donna, Danielle, and Richard on August 10, 2001; the State subsequently filed a notice of intent to seek the death penalty. The jury found Anthony guilty on all three counts on April 1, 2002.  Penalty proceedings began before a new jury on February 18, 2004.[4]  On March 2, 2004, that jury found three aggravating circumstances:  A.R.S. §§ 13-703(F)(5) (pecuniary gain), -(F)(8) (multiple homicides), and -(F)(9) (victim under the age of fifteen).  On March 10, after the penalty phase, the jury returned death verdicts for each murder.

## II.

¶25     Anthony raises eight issues on appeal.  Because we conclude that one issue requires reversal, we limit our discussion to that issue.

## A.

¶26     Although no stains were visible on the bed in Danielle's room, a Luminol test on the mattress was positive.  A

---

[4]     After the convictions, the Supreme Court of the United States decided *Ring v. Arizona*, 536 U.S. 584 (2002).  Subsequent legislation provided for a jury trial as to both the existence of aggravating circumstances and the appropriate sentence.  *See State v. Ring*, 204 Ariz. 534, 545 ¶ 13, 65 P.3d 915, 926 (2003).

subsequent forensic examination confirmed the presence of blood on the underside of the mattress top. A portion of the fabric where the stain was found was then subjected to DNA testing, which revealed at least three contributors. Danielle was identified as the "primary" contributor. The secondary contributors could not be positively identified, although Anthony and Donna could not be excluded.[5] The State's experts could not opine as to when or in what order the three DNA samples were deposited. The underside of the mattress top also tested positive for semen, which was identified as aspermatic. Anthony's semen was aspermatic as a result of a vasectomy.

¶27    The State contended that the forensic evidence from the underside of the mattress top showed that Anthony had sexually molested Danielle and that this was Anthony's motive for killing her. Anthony's lawyers filed a pre-trial motion in limine seeking, inter alia, to exclude "[a]ny suggestion or allegation" that Anthony had sexually molested Danielle.

¶28    After considering briefing on the motion in limine and extensive oral argument, the superior court firmly rejected Anthony's motion:

---

[5]    The State's expert explained his opinion that a particular person "could not be excluded" as meaning that the person was a "possible" donor. The expert contrasted such an opinion with other testimony that a specific donor had been identified; in that case, the expert positively opined as to the identity of the donor.

10

The state has circumstantial evidence that something sexual happened, and the state – whether you like the weight or not, you can argue the weight but what they've got is apparently semen mixed with Danielle's blood in Danielle's bed. That is untoward and that is evidence that they're going to be allowed to get into. You can attack it any way you want, but they're certainly allowed to argue an inference from that that something sexual was going on. They're certainly allowed to argue that. It is an inference to be drawn. Whether the jury accepts it or not is their business, but that's certainly allowable and if there's other evidence to bolster that, it seems to me it's relevant; it will come in.

**B.**

¶29     A significant portion of the trial was dedicated to evidence about the alleged molestation. The State presented evidence that Anthony had a vasectomy; that condoms were found in the septic tank; that Danielle had told a relative that Anthony was her "least favorite person"; and that Anthony had placed his hands on Danielle's chest and crotch while playing basketball.

¶30     In response, the defense offered evidence that Danielle was menstrual and that the small blood stain was in the middle of the bed. The defense also presented testimony of Ethan Ducharme, Richard's friend, that he and Richard had bought condoms and flushed them down the toilet; testimony that Anthony and Donna had slept several times on the mattress in Danielle's room; and testimony that Danielle was a straight "A" student

11

whose academic performance did not deteriorate during the time she was allegedly being molested.

¶31    In his closing argument, the prosecutor asked the jury to conclude that Anthony had molested Danielle and murdered her to cover up the molestation. The State returned to this argument and the evidence that allegedly supported it nearly a dozen times throughout its closing and rebuttal arguments. The prosecutor referred to Anthony as "a child molester" twice.

¶32    During the defense closing, Anthony's attorney argued that the evidence of molestation was so weak that the State had not even charged Anthony with this crime. The prosecutor responded as follows during rebuttal:

> [W]e obviously didn't charge him with [molestation] because we can't prove beyond a reasonable doubt what day or what month it occurred. And Danielle Romero is not here to tell you about it. But let me ask you this. If Danielle – if this was a trial in which Danielle was accusing her stepfather of sexually abusing her and she testified to that, and we had physical evidence showing his semen on her bed mixed in with her blood, would you convict him? I think you would.
>
> Well, Danielle isn't here. And that's the point. She's dead. And that's one of the reasons why she's dead. To keep her from telling anybody about it.

### c.

¶33    Anthony argues that the superior court erred in allowing the State to argue that he molested Danielle. A defendant's prior bad acts are not admissible "to show action in

12

conformity therewith," but can be used to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ariz. R. Evid. 404(b). Although the jury must ultimately determine whether the other act is proved, "before admitting evidence of prior bad acts, trial judges must find that there is clear and convincing proof both as to the commission of the other bad act and that the defendant committed the act." *State v. Terrazas*, 189 Ariz. 580, 582, 944 P.2d 1194, 1196 (1997). Even if the trial judge concludes that the prior act is shown by clear and convincing evidence, the judge must also (1) find that the act is offered for a proper purpose under Rule 404(b); (2) find that the prior act is relevant to prove that purpose; (3) find that any probative value is not substantially outweighed by unfair prejudice; and (4) give upon request an appropriate limiting instruction. *Id.* at 583, 944 P.2d at 1197.

## D.

¶34    The trial court concluded that there was "circumstantial evidence that something sexual happened" and that there was a possible "inference to be drawn" of "untoward" activity. The appropriate question under *Terrazas*, however, is whether there was clear and convincing evidence that Anthony molested Danielle. The trial court erred by applying the wrong legal standard to its evaluation of the prior bad acts evidence.

13

*State v. Vigil*, 195 Ariz. 189, 192 ¶ 16, 986 P.2d 222, 225 (App. 1999).

**¶35** Analyzing the DNA evidence under the *Terrazas* clear and convincing evidence standard, we conclude that the allegation that Anthony molested Danielle should have been excluded.[6] Three DNA profiles were in the tested portion of the mattress: Danielle's and possibly those of Anthony and Donna. The State's expert could not opine that the blood found was in fact Danielle's, only that she was the primary DNA contributor. The expert also could not opine that Anthony in fact contributed any DNA to the sample; he testified instead only that Anthony could not be excluded. Nor could the expert conclude that the semen was Anthony's, only that it was aspermatic.

---

[6] The decision whether to admit evidence of prior bad acts under Rule 404(b) is normally left to the trial judge's sound discretion. *State v. Gulbrandson*, 184 Ariz. 46, 60, 906 P.2d 579, 593 (1995). In this case, however, there is no dispute about the critical facts – the defense did not contest the accuracy of the DNA analysis of the mattress top. The issue for decision is thus purely legal – whether the uncontested facts constituted clear and convincing evidence that Anthony molested Danielle. *See State v. Bible*, 175 Ariz. 549, 595, 858 P.2d 1152, 1198 (1993) (stating that we review determinations about whether evidence satisfies the requisite legal standard de novo); *State v. Chapple*, 135 Ariz. 281, 297 n.18, 660 P.2d 1208, 1224 n.18 (1983) (noting that determinations made on undisputed facts present questions of "law or logic").

¶36    It is reasonable to assume that the aspermatic semen was Anthony's.  It is also reasonable to assume that the blood was Danielle's.  But even making these assumptions, the forensic evidence at most established that, at some point or points in time, Anthony's semen, Danielle's blood, and the DNA of a third person, perhaps Donna, were left on the mattress.  There was no evidence as to when the three individuals left the DNA, let alone whether any two of them left DNA at the same time.

¶37    This evidence fell far short of proving either that Danielle was molested or that Anthony had done so.[7]  It is clear that Anthony and Danielle were not the only prior users of the mattress; the tested sample also contained DNA of a third contributor, perhaps Donna.  It is difficult to understand how all three DNA contributions could have been made simultaneously; at least two of three DNA contributors were almost surely on the mattress at different times.  This evidence, even taking all inferences in the light most favorable to the State, simply does

---

[7]    The superior court appeared to consider only the mattress stain evidence in allowing the State to allege molestation. Even looking favorably on the cumulative evidence presented, however, we cannot conclude that there was enough for a jury to conclude by clear and convincing evidence that molestation occurred.  The presence of condoms in the septic tank is not strong evidence that Danielle was molested, and the testimony of the neighbor who saw Anthony touching Danielle while playing basketball is not very probative on the issue of whether Anthony had sexual relations with Danielle.

15

not establish that Danielle and Anthony were simultaneous occupants of the bed, much less that he molested her.[8]

**E.**

¶38     Anthony did not object at trial to the DNA evidence or to the State's final arguments.  The State therefore contends that our review is limited to fundamental error.  *See State v. Henderson*, 210 Ariz. 561, 567 ¶ 19, 115 P.3d 601, 607 (2005).  Anthony not only objected to the State's molestation allegations in his written motion in limine, however, but also strenuously reiterated his objections under Rule 404(b) during the oral argument on that motion.  The court directly addressed those arguments and ruled squarely against Anthony.  "[W]here a motion in limine is made and ruled upon, the objection raised in that motion is preserved for appeal, despite the absence of a specific objection at trial."  *State v. Burton*, 144 Ariz. 248, 250, 697 P.2d 331, 333 (1985).  We therefore must determine

---

[8]     We need not today decide whether the superior court should have also have excluded the State's allegations because any probative value was substantially outweighed by potential prejudice.  We note, however, that we have repeatedly cautioned that "[t]here will be situations in which evidence sought to be introduced is more prejudicial than probative, and those situations are very likely to arise in the prior bad act context."  *State v. Ives*, 187 Ariz. 102, 111, 927 P.2d 762, 771 (1996); *see also State v. Taylor*, 169 Ariz. 121, 124, 817 P.2d 488, 491 (1991) ("'The discretion of the trial judge under Rule 403 to exclude otherwise relevant evidence because of the risk of prejudice should find its most frequent application in th[e 404(b)] area.'") (quoting 1 Morris Udall et al., *Arizona Practice: Law of Evidence* § 84 (3d ed. 1991)).

16

whether the error below was harmless.  *Henderson*, 210 Ariz. 561 at 567 ¶ 18, 115 at 607.

**¶39**        "Error, be it constitutional or otherwise, is harmless if we can say, beyond a reasonable doubt, that the error did not contribute to or affect the verdict."  *Bible*, 175 Ariz. at 588, 858 P.2d at 1191; *accord State v. Bolton*, 182 Ariz. 290, 303, 896 P.2d 830, 843 (1995).  "'The inquiry . . . is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.'"  *Bible*, 175 Ariz. at 588, 858 P.2d at 1191 (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993)).  The State has the burden of convincing us that any error was harmless.  *Id.*

**¶40**        We are unable to conclude that the State has discharged this burden here.  The trial court properly instructed the jury that the "other acts" evidence could be considered only on the issue of Anthony's motive to murder Danielle, not as proof that he did so.  But, as we noted in *Terrazas*,

> [s]uch evidence is quite capable of having an impact beyond its relevance to the crime charged and may influence the jury's decision on issues other than those on which it was received, despite cautionary instructions from the judge.  Studies confirm that the introduction of a defendant's prior bad acts can easily tip the balance against the defendant.

17

189 Ariz. at 584, 944 P.2d at 1198 (internal citations and quotations omitted). The danger of prejudice is markedly heightened when the "other act" allegation is that the defendant molested his step-daughter. Moreover, the allegation here was not a passing reference, but rather a repeated theme of the State's closing argument.[9]

¶41 We can find error harmless when the evidence against a defendant is so overwhelming that any reasonable jury could only have reached one conclusion. *See State v. Sansing*, 206 Ariz. 232, 237 ¶ 16, 77 P.3d 30, 35 (2003) (finding constitutional error harmless because no reasonable jury could have failed to find a capital aggravating circumstance); *State v. Ring*, 204 Ariz. 534, 560 ¶ 79, 65 P.3d 915, 941 (2003) (articulating harmless error standard). But this is not such a case. The evidence of Anthony's guilt was sufficient to support the judgments of conviction. But the issue before us is not whether the jury was justified in its verdict or even whether we would reach the same result. Rather, we must determine whether the State has demonstrated that the verdict was "surely unattributable" to the allegation that Anthony had molested his step-daughter.

---

[9] We do not suggest any misconduct on the part of the State. The prosecution properly obtained a ruling from the superior court that it could make such arguments and scrupulously reminded the jury that evidence of other acts could be considered only on the issue of motive.

**¶42** Applying the "stringent concepts" of harmless error review, *Bible*, 175 Ariz. at 588, 858 P.2d at 1191, we are unable to conclude beyond a reasonable doubt that the improperly admitted allegations of child molestation did not affect the verdict. We are therefore constrained to reverse.

### III.

**¶43** For the reasons above, we reverse Anthony's convictions and remand for a new trial.


_____
Andrew D. Hurwitz, Justice

CONCURRING:


_____
Ruth V. McGregor, Chief Justice


_____
Rebecca White Berch, Vice Chief Justice


_____
Michael D. Ryan, Justice


_____
W. Scott Bales, Justice