NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

DJUAN LA SHAUN BAKER, *Appellant*.

No. 1 CA-CR 21-0071
FILED 3-3-2022

Appeal from the Superior Court in Maricopa County
No.  CR 2015-02551-001
The Honorable Howard D. Sukenic, Judge
The Honorable Cari A. Harrison, Judge (Retired)

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Jillian Francis
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Jesse F. Turner
*Counsel for Appellant*

## MEMORANDUM DECISION

Judge Michael J. Brown delivered the decision of the Court, in which Presiding Judge Maria Elena Cruz and Judge Samuel A. Thumma joined.

B R O W N, Judge:

¶1           Djuan Baker appeals from his convictions and sentences for fraudulent schemes and artifices, theft, and forgery.  He argues the superior court erred by permitting the State to cross-examine a defense witness on matters that constituted improper lay opinion evidence as well as being irrelevant, unfairly prejudicial, and beyond the witness's personal knowledge.  Baker also contends the court erred by denying his attorney's request that Baker be recalled to provide additional testimony.  Because the State's cross-examination did not prejudice Baker, and the court acted within its discretion in denying his request to reopen evidence, we affirm.

## BACKGROUND

¶2           In March 2014, Baker met J.J. at a gym and the two became friends.  J.J. worked for a bank and Baker worked as a personal trainer.  A few weeks later, Baker asked J.J. if he could deposit his client's checks into J.J.'s personal bank account.  Baker explained that he wanted to prevent his girlfriend from accessing the money and offered to give J.J. part of it.

¶3           The checks, however, were not from Baker's clients; they were from bank accounts opened by Baker.  Each of these accounts, except one, were established under fictitious names.  Baker wrote seven checks from these accounts, knowing there were insufficient funds, and deposited the checks into J.J.'s bank account between April 30 and May 29.  After the checks were deposited, J.J. would withdraw the money.[1]

¶4           Sometime later, J.J.'s bank informed him the checks did not clear, resulting in a negative balance.  The bank also told J.J. the checks appeared fraudulent and eventually closed J.J.'s account with a negative

---

[1]      The process of depositing checks with insufficient funds and then withdrawing cash before the deficiency is discovered is a type of fraudulent conduct commonly known as "check-kiting."

balance of $1,882. In a text exchange around the same time, J.J. told Baker his bank card was not working and asked him if the checks were "good." Baker responded "[y]eah," and said the clients were reliable. J.J. later texted Baker that the bank had closed his (J.J.'s) account, and that the checks turned out to be "fake." Baker responded that he would pay J.J. back and offered to help fix the issue.

¶5 When J.J. texted Baker that the police were involved, Baker asked for the investigating officer's contact information. Baker called the officer and told him that all the checks, except for the one in his own name, belonged to his clients. Baker also told the officer he wanted to hide the funds from his girlfriend, and that J.J. had kept all of the money that was deposited.

¶6 Baker was charged with fraudulent schemes and artifices, a class 2 felony; theft, a class 3 felony; and eight counts of forgery, each a class 4 felony.[2] Among other trial witnesses, the State called J.J., who testified about his dealings with Baker.

¶7 After the State's case in chief, Baker's first witness was S. Jefferson, who testified about his alleged interactions with J.J. According to Jefferson, by coincidence, he was in the same jail as J.J. for two days in October 2018. Jefferson testified that he was previously acquainted with J.J. through social contact and that while in jail, J.J. told Jefferson about the check-kiting case involving Baker. Jefferson stated that based on their conversations, it appeared that J.J. not only knew that he was participating in a check-kiting scheme, but that he orchestrated it. Jefferson also reported that J.J. said he told Baker to "do it one more time," and that J.J. threatened to "handle" Baker's family if Baker did not comply. Jefferson then explained that he was coincidentally transferred to the same jail where Baker was being held. After discovering that Baker was the same man from J.J.'s story, Jefferson tried to discuss the case with Baker. When Baker refused, Jefferson contacted Baker's attorney.

¶8 During cross-examination of Jefferson, the State provided him with a copy of the text messages between Baker and J.J., and asked a number of questions about what the messages said. The State followed up on this line of questioning with various hypotheticals, asking how Jefferson

---

2 One of the forgery counts arose from Baker's separate dealings with a different friend, M.L. Baker wrote M.L. a check with insufficient funds, which M.L. attempted to cash. At trial, Baker claimed the check was actually an "IOU," and that M.L. was never supposed to cash it.

would have felt or reacted were he in Baker's or J.J.'s position. The State also gave Jefferson details derived from bank records, and asked if he would be "surprised" to find out the information was true.

¶9            The State then recalled J.J., who testified that he did not know Jefferson and never talked to anyone about the case while incarcerated. J.J. also denied threatening Baker or forcing him to participate in the check-kiting scheme.

¶10            After the State rested, Baker testified that J.J. was the one who came up with the check-kiting scheme and asked Baker to participate. Baker claimed he declined the offer. The next time they saw each other, J.J. asked again, but Baker declined. According to Baker, later that night as he was walking to his car, J.J. called out Baker's name, and then hit Baker in the back of the head with a gun. J.J. then forced Baker into a car and told him he was not asking him to "do this anymore. I'm telling you this is what you are going to do." Baker testified that J.J. said he knew where Baker lived, and what his girlfriend and kids looked like, and that J.J. threatened to hurt or kill one of them if Baker did not participate in the check-kiting scheme. J.J. then instructed Baker how to conduct the scheme, ordering him to open the accounts and write the checks.

¶11            When cross-examined about the text messages, Baker testified that he and J.J. were speaking in "code," and that he was only playing along with the story he and J.J. were creating. He also claimed he told the investigating officer false information because he had to keep up the story so his family would remain safe. After Baker completed his testimony, and after a weekend break, Baker's counsel sought to recall him for further testimony. The State objected and, after receiving a proffer of the questions Baker's counsel would ask, the court denied the request to recall Baker. The court reasoned that the issues described in the proffer were not "relevant for the jury's consideration," and that any limited relevance would be outweighed by a danger of "opening up other areas that then become collateral to this case."

¶12            A jury convicted Baker on all counts and the superior court imposed presumptive, concurrent prison terms totaling 9.25 years. Baker timely appealed, and we have jurisdiction under A.R.S. § 12–120.21(A)(1).

## DISCUSSION

### A.    Cross-Examination of Jefferson

¶13    Baker argues the superior court erred by permitting the State to cross-examine Jefferson on matters that were irrelevant, outside his knowledge, inappropriate lay opinions, and unfairly prejudicial. We review rulings on the admission of evidence for an abuse of discretion. *State v. Togar*, 248 Ariz. 567, 571, ¶ 12 (App. 2020). Because Baker did not preserve the issue at trial with a timely, specific objection and raises this issue for the first time on appeal, we review for fundamental error only. *See State v. Escalante*, 245 Ariz. 135, 140, ¶ 12 (2018). To establish fundamental error, Baker must show "(1) the error went to the foundation of the case, (2) the error took from the defendant a right essential to his defense, *or* (3) the error was so egregious that he could not possibly have received a fair trial." *Id.* at 142, ¶ 21. If that burden is satisfied, he must then show the error was prejudicial. *Id.*

¶14    During cross-examination, the State asked Jefferson to read several texts sent between Baker and J.J., and then asked Jefferson about what those messages said:

> Q. Okay. So after you just read the text messages -- when you read those text messages, the ones from [Baker], does it appear as though [Baker] is -- is there a threat in there to [Baker] about the checks?
>
> A. No.
>
> Q. And, in fact, the text messages actually refer to [J.J.]telling [Baker] the checks are fake. What's going on; right?
>
> A. I guess.
>
> Q. Basically?
>
> A. I don't know.

The State then read aloud a specific text from Baker, in which Baker told J.J., "I'll have the money next week. I just did a transfer for it. If you want to go to the police Tuesday, I'll get a lawyer and fight it. Now, if you don't, I'll fix this with you. It's your choice." The State asked Jefferson, based on this text, if it sounded like Baker was being threatened, and whether it seemed like Baker was trying to fix the issue. The State also posed a series

of hypotheticals, asking Jefferson how he would have reacted were he in Baker's position. Jefferson testified about how he thought he would respond, explaining his choices were based on "street code."

¶15        The State then asked Jefferson about a text in which Baker promised to pay the outstanding negative balance on J.J.'s account:

> Q. Would that be fixing it, is paying this money?
>
> A. Yes.
>
> Q. Would you be surprised to know that he never did?
>
> A. I'm not sure. I don't know Mr. Baker like that.
>
> Q. Okay. I'm just asking if you would be surprised based upon -- you said, like, street code, you'd try to fix it?
>
> A. Yeah.
>
> Q. Would you be surprised if in street code he didn't fix it?
>
> A. Yeah. I would be surprised. If he said he's going to fix it, he'[d] fix it.

When Jefferson was asked if he would be upset if he were in J.J.'s position, Jefferson said yes.

¶16        The prosecutor also asked Jefferson about the bank transactions:

> Q. And would you be surprised that the checks that were being deposited into that -- it was a Bank of America account that the checks were being deposited to. Would you be surprised that every one of those checks that was deposited into that bank account all came from [Baker]?
>
> A. Yes, I would be surprised.
>
> Q. And, in fact, every check that was deposited in there came from an account from [Baker], not just that the checks belonged to him and he was depositing it. They were from his own account. Would that surprise you?
>
> A. Yeah.

Q. And, in fact, none of the accounts that had checks deposited into [J.J.'s] Bank of America account were [from] any of [J.J.'s other] accounts. They were all from [Baker]. Would that surprise you?

A. Yes.

¶17        Baker argues the State improperly cross-examined Jefferson with facts derived from bank records.  He contends this testimony violated Arizona Rule of Evidence ("Rule") 602, which limits a lay witness's testimony to matters in which the witness has personal knowledge.  It is undisputed that Jefferson had no firsthand knowledge of the actual check-kiting scheme, as he had never seen the bank records and had no prior knowledge of the bank transactions.  According to Baker, any comment on such matters by Jefferson would necessarily require Jefferson to testify to matters outside his personal knowledge.

¶18        We conclude that Jefferson's testimony on this matter was within his personal knowledge.  The State never showed Jefferson the bank records or asked Jefferson to interpret them.  He was merely presented with facts apparent from the bank records and asked if he found them surprising. Jefferson was not asked about his personal knowledge regarding the bank transactions; instead, the State simply pointed out Jefferson's lack of knowledge as to these details.  Thus, the superior court did not violate Rule 602 by allowing this testimony.

¶19        Baker's primary argument is that the State impermissibly cross-examined Jefferson with the text messages between Baker and J.J., and improperly asked how Jefferson would have personally reacted in Baker's or J.J.'s position.  Baker contends the cross-examination with the text messages violated Rule 602, as Jefferson was not a part of the text conversation and had never seen these texts before trial.  Baker also asserts the cross-examination on these matters introduced irrelevant evidence.

¶20        Evidence is only relevant if "(a) it has any tendency to make a fact more or less probable than it would be without evidence; and (b) the fact is of consequence in determining the action."  Rule 401.  "Irrelevant evidence is not admissible."  Rule 402.  Baker asserts that how Jefferson would have felt or reacted in J.J.'s position, his interpretation of the text messages, and his opinions on street code did not tend to make any facts more or less probable, and were of no consequence to the ultimate issue at trial—whether Baker or J.J. was more credible.  For similar reasons, Baker

argues the cross-examination on these matters violated Rules 403 (unfair prejudice) and 701 (improper-lay-witness opinion).

**¶21** Assuming without deciding that the superior court fundamentally erred by allowing the State to cross-examine Jefferson on questions concerning how he interpreted the messages, or how he would have reacted if he found himself in J.J.'s or Baker's position, we consider whether the error was prejudicial. To establish prejudice under fundamental error review, Baker must show that without the allegedly improper cross-examination of Jefferson, a reasonable jury could have reached a different verdict. *Escalante*, 245 Ariz. at 144, ¶ 29.

**¶22** The texting exchange on which Jefferson was cross-examined had already been admitted as an exhibit, and was therefore available for the jury to review. The texts were also read into the record. And although Jefferson was asked to interpret the texts, he was not asked to draw any conclusions that were not apparent from the plain language of those messages. Thus, any error caused by the State in questioning Jefferson about these texts was not prejudicial. *Cf. Ryan v. San Francisco Peaks Trucking Co., Inc.*, 228 Ariz. 42, 52, ¶ 39 (App. 2011) (holding that an improper cross-examination of a witness under Rule 602 was harmless because the witness was cross-examined with documents already admitted as exhibits).

**¶23** Baker contends nonetheless that he was prejudiced by Jefferson's testimony addressing hypothetical reactions, asserting the testimony misled and confused the jury as to the ultimate factual issues of the case. Baker argues the State's emphasis on Jefferson's judgment misdirected the jury's focus, suggesting it may have deferred to Jefferson's judgment and opinions when making credibility determinations about J.J. and Baker. Thus, because J.J. and Baker's credibility were critical issues to Baker's duress defense, Baker contends a reasonable probability existed that the jury could have come to a different conclusion.

**¶24** But the prejudice standard is not so easily satisfied. *See Escalante*, 245 Ariz. at 144, ¶ 31. Prejudice analysis necessarily excludes "imaginative guesswork." *Id.* Baker's assertion that the jury was unduly swayed by irrelevant information amounts to little more than speculation, given that the jury was properly instructed on the legal issues at hand, including the duress defense. *See State v. Dickinson*, 233 Ariz. 527, 531, ¶ 13 (App. 2013) (stating that a defendant claiming fundamental error "must affirmatively 'prove prejudice' and may not rely upon 'speculation' to carry

his burden"); *see also State v. Newell*, 212 Ariz. 389, 403, ¶ 69 (2006) ("[W]e presume jurors follow the court's instructions . . . .").

**¶25**         Moreover, in applying the prejudice standard, we "examine the entire record, including the parties' theories and arguments as well as the trial evidence." *Escalante*, 245 Ariz. at 144, ¶ 31. Error may be harmless in the context of other evidence. *See State v. Burns*, 237 Ariz. 1, 15, ¶ 38 (2015). Contrary to Baker's assertion, the text messages between him and J.J. provided strong evidence that Baker was an active participant and not acting under duress, and Baker's assertions that these messages were in "code" and that he was just going along with the façade, are unpersuasive. Moreover, Baker's statements to police confirm the version of events described by J.J.

**¶26**         Thus, even if Jefferson's cross-examination elicited some evidence that was irrelevant or beyond Jefferson's personal knowledge, Baker has not shown he was prejudiced. The text messages were already in evidence and the risk that these alleged errors posed is speculative. No reversible error occurred.

### B.     Reopening of Baker's Testimony

**¶27**         Baker also argues the superior court abused its discretion by denying his request to reopen his own testimony. A trial court has broad discretion over reopening evidence. *State v. Walton*, 159 Ariz. 571, 582 (1989), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002). Further, the court "has discretion to determine whether the probative value of evidence is outweighed by the danger of unfair prejudice or confusion of the issues." *State v. Smith*, 250 Ariz. 69, 89, ¶ 76 (2020).

**¶28**         After defense counsel said he had no further questions for Baker, the court proceeded to ask questions posed by the jury. Among other things, the jury asked Baker why he did not contact the police after he was first threatened by J.J. Baker responded that he was afraid J.J. would find out and retaliate by shooting either his girlfriend or one of his kids. Defense counsel then stated he had no further questions and the jury was dismissed. The following trial day, held after a weekend break, defense counsel requested to recall Baker to testify. Counsel told the court that the purpose of this testimony would be to explain why Baker had not disclosed the threats underlying his duress defense until the 2019 trial. In the proposed testimony, Baker would explain that in 2015 he discovered J.J. had prior felony convictions, and because that made J.J. a prohibited firearm possessor, Baker was no longer fearful of J.J. The court denied the request,

finding that the proposed testimony was probably not relevant, and even if it was marginally relevant, it would be more prejudicial than probative and therefore barred under Rule 403.

**¶29**    Baker argues the court erred in finding unfair prejudice. He contends the testimony was relevant because it would have shown why he did not disclose the threats underlying his duress defense until trial. Baker also contends that whatever prejudice may have resulted from revealing J.J.'s status as a prohibited possessor was minimal, and argues "[t]he danger that the jury may improperly consider the evidence or apply it in an improper manner does not in itself provide a reason for exclusion." *Readenour v. Marion Power Shovel*, 149 Ariz. 442, 449 (1986).

**¶30**    Baker had already testified that the reason he did not come forward about the alleged threats from J.J. was because he was afraid J.J. would retaliate with a firearm, so Baker's proposed testimony would have had minimal probative value. Additionally, the proffered testimony does little to explain why Baker did not report the alleged threats between 2015, when he allegedly discovered J.J.'s felony status, and the 2019 trial. And as explained by the superior court, the persuasive value of this additional detail was suspect because "the mere fact that somebody is on probation doesn't necessarily mean that they don't possess guns."

**¶31**    Even if the court erred, it did not affect the verdict. *State v. Anthony*, 218 Ariz. 439, 446, ¶ 39 (2008). Error is harmless when, beyond a reasonable doubt, the error did not contribute to the verdict. *Id.* The State bears the burden of showing the error was harmless. *Id.* Baker testified extensively regarding his duress defense. He also explained, in response to a jury question, that he did not come forward because he was afraid J.J. would retaliate with a firearm. And before closing arguments, Baker requested that the State not mention that the duress defense was recently disclosed. The State agreed and did not mention the recency of the disclosure during closing. Thus, Baker was not harmed when the court denied him an additional opportunity to further explain the recent disclosure of his duress defense.

## CONCLUSION

¶32        We affirm Baker's convictions and sentences.



AMY M. WOOD • Clerk of the Court
FILED:   AA