NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

MICHAEL ALAN JAYNES, *Appellant.*

No. 1 CA-CR 21-0343
FILED 8-10-2023

Appeal from the Superior Court in Mohave County
No.  S8015CR201901354
The Honorable Douglas Camacho, Judge *Pro Tempore*

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Celeste Kinney
*Counsel for Appellee*

Mohave County Legal Advocate, Kingman
By Jill L. Evans
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

---

Judge James B. Morse Jr. delivered the decision of the Court, in which Presiding Judge Jennifer B. Campbell and Judge Randall M. Howe joined.

---

**M O R S E**, Judge:

¶1          Michael Alan Jaynes appeals his conviction and sentence for aggravated assault.  He argues the superior court violated *State v. Ewer*, 254 Ariz. 326 (2023), by instructing the jury on a justification defense that applied only to the victim's conduct and allowing the State to argue justification from the victim's perspective.  He also asserts the court erred by giving a flight-or-concealment jury instruction.  For the following reasons, we affirm.

**FACTS[1] AND PROCEDURAL BACKGROUND**

¶2          In March 2019, E.R.[2] began a romantic relationship with Jaynes's wife, K.P.  Jaynes learned about the affair and, in April, left E.R. a threatening voicemail.

¶3          Over the Memorial Day weekend, Jaynes and K.P. attended a family event in Laughlin, Nevada.  On Saturday, K.P. left the event to visit her mother in Topock, Arizona, about 45 minutes away.  E.R. lived within walking distance of K.P.'s mother's house.  That night, K.P. and her friend, A.L., went to E.R.'s home to visit.

¶4          Jaynes, suspicious that K.P. was with E.R., drove to Topock late that night.  Shortly before Jaynes reached the area, K.P. called and told him that she was at E.R.'s home and planned to sleep there.

¶5          Jaynes arrived a few minutes later, still on the phone with K.P. Without disclosing that he was there, he entered E.R.'s home through the front door, listened for K.P.'s voice, and found her in a bathroom.  K.P. was "surprised" when Jaynes unexpectedly appeared.  The two had a brief

---

[1]          We view the evidence and all reasonable inferences drawn therefrom in the light most favorable to upholding the verdict. *State v. Riley*, 196 Ariz. 40, 42, ¶ 2 (App. 1999).

[2]          We identify the victim and civilian witnesses by their initials.  *See* Ariz. R. Sup. Ct. 111(i).

conversation about leaving E.R.'s home when K.P. became combative because she wanted to stay.

¶6            Upset, Jaynes walked out the back door of the house and into E.R.'s backyard where he encountered E.R., A.L., and E.R.'s friend, D.H. Jaynes approached E.R., telling him to "stay away from [his] wife" and that he "better watch [his] back."

¶7            Jaynes "rushed" at E.R. and repeatedly struck him with a gun, causing multiple injuries. While Jaynes and E.R. wrestled on the ground, the gun discharged, E.R. let go of the gun, and D.H. jumped over the backyard fence. K.P. told them to stop fighting. Jaynes eventually stood up, walked away, and pointed the gun at his own head. K.P. pleaded with Jaynes not to kill himself, and he finally relented when she said that she would leave with him.

¶8            Jaynes and K.P. soon drove away in his truck. E.R. then called 911, and about 30 minutes later, E.R. called Jaynes. A call log from E.R.'s phone showed a 43-second call with Jaynes that night.

¶9            Jaynes and K.P. parked and had a conversation about their relationship before Jaynes dropped K.P. off at E.R.'s home. Jaynes then drove back to Laughlin before returning to his California home.

¶10            Soon after Jaynes left E.R.'s home, a deputy arrived to investigate the incident. K.P. told the deputy that Jaynes had pushed E.R. to the ground and punched him. When she heard the gunshot, Jaynes was standing with the gun in his hands. She did not see anyone else holding the gun, nor had she seen E.R. carrying a gun at any point earlier that night.

¶11            The deputy observed three gunshot marks on the deck and wall around E.R.'s pool. He also saw that E.R. had suffered head injuries. The deputy did not find the gun or any shell casings or bullet fragments. The deputy explained at trial that a revolver would not have left any shell casings behind because that type of gun does not eject them. The deputy unsuccessfully attempted to contact Jaynes that night.

¶12            A grand jury indicted Jaynes on one count of attempted second-degree murder of E.R., a class two felony (count one); two counts of aggravated assault by intentionally placing E.R. in reasonable apprehension of imminent physical injury while using a deadly weapon or dangerous instrument (counts two and three); one count of aggravated assault by intentionally, knowingly, or recklessly causing E.R. physical injury while using a deadly weapon or dangerous instrument (count four);

and one count of aggravated assault by intentionally placing D.H. in reasonable apprehension of imminent physical injury while using a deadly weapon or dangerous instrument (count five). Before trial, the superior court granted the State's motion to dismiss count three, as a duplicate of count two.

¶13　　　　At trial, Jaynes testified that he intended to go to E.R.'s house "to grab [K.P.] and bring her back to Laughlin." He further testified that the front door was open so he walked in and walked down the hall listening for K.P.'s voice. Jaynes then found K.P. and had what he described as a "combative" and "emotional" conversation with her in which she refused to leave with him. Jaynes testified that after K.P. refused, he went through the backdoor to the backyard to tell E.R. "to stay away from my wife and that we're leaving." Jaynes said he advanced to about three feet from E.R. when E.R. pulled a gun from his pocket and pointed it at Jaynes. Jaynes said he panicked, "grabbed for the gun," and tried to "take it out of [E.R.'s] hands" by "yanking the gun up and down hitting [E.R.] in the head." During the struggle for the gun, E.R. and Jaynes tripped over the backyard stairs, and the gun "went off next to [E.R.'s] head." Jaynes testified he "set the gun down at the back door" on his way out with K.P. Jaynes also admitted that he had previously left a threatening voicemail on E.R.'s phone and did not have permission to enter E.R.'s house or backyard. He also denied intentionally firing the gun at anyone and denied having a phone conversation with E.R. that night.

¶14　　　　Conversely, E.R. testified that Jaynes entered his backyard and fired a gun at him while yelling, "You ruined my life. I'm going to . . . kill you, [E.R.]" E.R. stated that he tried to stand up when Jaynes "rushed" at him and struck him with the gun "multiple times." E.R. also testified that Jaynes fired a shot at D.H., who fled, and that he later spoke with Jaynes about the incident when Jaynes asked him to "make . . . up that it was a home invasion robbery."

¶15　　　　A.L. testified in the defense's case. A.L. explained that he saw E.R. pull a "small, dark" pistol out of his pocket, which Jaynes grabbed. Jaynes and E.R. tripped over the steps where E.R. was standing, and the gun went off. Jaynes was on top of E.R. "slapping him"; E.R. was on his back trying to defend himself. A.L. acknowledged that Jaynes may have had an item in his hand when he came out of the house.

¶16　　　　While discussing legal matters on the second day of trial, the State noted that Jaynes's case presented "some interesting issues as to jury instructions" following this Court's decision in *State v. Ewer*, 250 Ariz. 561

(App. 2021), *vacated in part*, 254 Ariz. 326, 331, ¶ 23 (2023).[3] In that case, the defendant shot and killed the victim at the victim's residence during an altercation over a drug transaction. *Ewer*, 254 Ariz. at 328, ¶¶ 2-4. The superior court granted the State's request to replace the word "defendant" in the Revised Arizona Jury Instructions ("RAJI") on justification defenses with "person," the term that the justification statutes use. *Id.* at 328-29, ¶¶ 5-6. The court also allowed the State to argue the victim's conduct was legally justified. *Id.* at 329, ¶¶ 6-7. Concluding "[j]ustification presumptions are not intended to apply to the victim's conduct," we found that the "modified jury instructions and the state's argument applying them to the victim, including the presumption of reasonableness, were therefore improper." *Ewer*, 250 Ariz. at 567, ¶ 18.

**¶17** With *Ewer* in mind, the State argued that if the superior court decided to instruct the jury on Jaynes's self-defense claim, it should additionally "craft" a justification instruction that would allow the jury to "assess the reasonableness of the defendant's belief that [E.R.] was engaging in unlawful force." During the settling of final instructions and over Jaynes's objection, the superior court granted the State's request to provide a "slightly modified" defense-of-premises justification instruction. The court later issued the following instruction in the final jury instructions:

> If a person is in lawful possession or control of a premises, it is lawful for that person to threaten to use deadly physical force in defense of the premises if a reasonable person in the situation would have believed it immediately necessary to prevent or terminate the commission or attempted commission of a criminal trespass by another person in or upon the premises. The force threatened may not be greater than reasonably necessary to prevent the attempted criminal trespass. A person commits criminal trespass by knowingly entering or remaining unlawfully in a fenced residential yard or a residential structure.

**¶18** In relevant part, the superior court also provided the following instructions on the justified use of force:

---

[3] At the time, the State had a petition for review pending before the Arizona Supreme Court.

A defendant is justified in using or threatening physical force in self-defense if the following two conditions existed:

1. A reasonable person in the situation would have believed that physical force was immediately necessary to protect against another's use or attempted use of unlawful physical force; and

2. A defendant used or threatened no more physical force than would have appeared necessary to a reasonable person in the situation.

A defendant is not justified in using or threatening physical force against another:

1.  In response to verbal provocation alone; or

2.  If the defendant provoked the other's use of unlawful physical force, unless

    a.  The defendant withdrew from the encounter or clearly communicated to the other person the defendant's intent to withdraw, reasonably believing that the defendant could not withdraw from the encounter; and

    b.  The other person nevertheless continued or attempted to use unlawful physical force against the defendant.

A defendant may use deadly physical force in self-defense only to protect against another's use or attempted use of deadly physical force.

¶19          Furthermore, at the jury instructions conference, the superior court granted the State's request to provide a flight-or-concealment instruction ("flight instruction") over Jaynes's objection. The court based its decision on the State's evidence showing Jaynes "was the last person seen with the gun" and then left the crime scene, thereby permitting a reasonable inference "that the defendant concealed the location of the firearm or perhaps disposed of the firearm." The court further noted that "[t]here's evidence that the defendant left the scene after the incident and that . . . could be an inference that the defendant was running away from the incident."

¶20 In the State's summation, Jaynes "was the aggressor" and thus could not claim self-defense. The State urged the jury to consider where the incident occurred and "that the defendant was uninvited, and nobody knew that he was going to come through that door and out that backyard except for him." The State asserted, "What [E.R.] did in his own house in his own backyard on his own property was not unlawful. How could what [E.R.] did be unlawful? So the justification here clearly does not apply."

¶21 In rebuttal closing argument, the State again explained its theory: "[F]or you to believe that the defendant was justified, you'd have to ignore all the evidence that the state presented and have found . . . that the use by [E.R.] was somehow unlawful physical force." He argued, "The instruction from the judge is if a person in lawful possession or control[ of] premises, [E.R.'s] house, it is lawful for that person to threaten or to use deadly physical force in defense of the premises if a reasonable person in that situation would have believed it immediately necessary to prevent or terminate the crime of trespass."

¶22 The jury found Jaynes guilty on count two and acquitted him of the remaining charges. The superior court sentenced him to a mitigated term of 5 years' imprisonment. Jaynes timely appealed.

¶23 During this appeal's pendency, the Arizona Supreme Court granted review in *Ewer*. Because that decision would likely inform our resolution here, we stayed Jaynes's appeal and invited the parties to file supplemental briefs following *Ewer*'s issuance, which occurred in January 2023. The parties subsequently filed supplemental briefing, and we lifted our stay. We have jurisdiction under A.R.S. §§ 12-120.21(A)(1), 13-4031, and -4033(A)(1).

## DISCUSSION

### I. Defense-of-Premises Instruction.

¶24 Relying on *Ewer*, Jaynes argues the superior court erred by providing the defense-of-premises instruction. The State counters that the "jury instructions correctly conveyed the applicable law in accordance with *Ewer*" and thus no error occurred. Specifically, the State (1) asserts *Ewer* is distinguishable because the self-defense instruction here properly referred to "defendant" rather than "person"; and (2) cites *Ewer*, 254 Ariz. at 331, ¶ 22, for its contention that the court's criminal-trespass instruction permissibly assisted the jury in assessing Jaynes's justification defense.

7

¶25          We review a decision to give a jury instruction for an abuse of discretion but review de novo whether a given instruction accurately states the law. *State v. Solis*, 236 Ariz. 285, 286, ¶ 6 (App. 2014). Because Jaynes preserved his objection to the instruction, his claim is subject to harmless-error analysis. *State v. Dann*, 205 Ariz. 557, 564-65, ¶¶ 14, 18 (2003).

¶26          Courts must instruct the jury on any theory "reasonably supported by the evidence." *State v. Burns*, 237 Ariz. 1, 17, ¶ 48 (2015); *see State v. Ruggiero*, 211 Ariz. 262, 264-65, ¶ 10 (App. 2005) (explaining courts err by giving an instruction "unless it is reasonably and clearly supported by the evidence"). A party is entitled to a justification instruction when the "slightest evidence" supports it. *State v. Almeida*, 238 Ariz. 77, 79, ¶ 9 (App. 2015).

¶27          We begin our analysis with the decision in *Ewer*. Our supreme court concluded that because "the justification defense provided by § 13-404(A) only applies to a defendant's conduct," the superior court erred by replacing "defendant" with "person" in the RAJI justification instructions. *Ewer*, 254 Ariz. at 328, 330-31, ¶¶ 1, 17-18, 23. *Ewer* makes clear that only criminal defendants may invoke justification defenses and the superior court may have erred in issuing the defense-of-premises instruction.

¶28          But "[w]e need not decide whether" the superior court erred if "any error was harmless beyond a reasonable doubt." *State v. Armstrong*, 218 Ariz. 451, 460, ¶ 33 (2008); *see State v. Johnson*, 205 Ariz. 413, 421, ¶ 27 (App. 2003) ("When an error has been made in the jury instructions, we consider whether the error was harmless."). An error is harmless if the State demonstrates "beyond a reasonable doubt, that the error did not contribute to or affect the verdict" or sentence. *State v. Anthony*, 218 Ariz. 439, 446, ¶ 39 (2008). "The inquiry . . . is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." *Id.* (quoting *State v. Bible*, 175 Ariz. 549, 588 (1993)). The State may meet its burden if "the evidence against a defendant is so overwhelming that any reasonable jury could only have reached one conclusion." *Id.* at ¶ 41.

¶29          The State argues any *Ewer* error was harmless because "[e]very single witness, including Jaynes, testified that Jaynes showed up unannounced" at E.R.'s home, then initiated the confrontation. Jaynes, on the other hand, maintains "a reasonable jury could have found that [E.R.]

was the initial aggressor who used deadly force" based on his and A.L.'s testimony that E.R. "had the gun and pointed it at [Jaynes]."

¶30 Jaynes's sole defense to the charged offenses was justification, claiming he entered the backyard unarmed and defended himself when E.R. brandished a handgun. Absent justification, Jaynes does not challenge the facts proving his commission of aggravated assault. *See* A.R.S. § 13-205 ("Justification defenses describe conduct that, if not justified, would constitute an offense but, if justified, does not constitute criminal or wrongful conduct."); *State v. Carson*, 243 Ariz. 463, 465-66, ¶¶ 9, 11 (2018). Given this circumstance, our harmless-error analysis thus turns on whether the State proved Jaynes unjustifiably committed aggravated assault. *See Carson*, 243 Ariz. at 466, ¶ 11 ("[O]nce sufficient self-defense evidence is admitted, the absence of self-defense becomes an additional element the state must prove to convict.").

¶31 "An essential element of self-defense is the accused's freedom from fault in provoking the difficulty that gives rise to the use of the force." *State v. Zamora*, 140 Ariz. 338, 341 (App. 1984); *see* A.R.S. § 13-404(B)(3) (stating "the threat or use of physical force against another is not justified" when "the person provoked the other's use or attempted use of unlawful physical force," unless the "person withdraws from the encounter or clearly communicates to the other his intent to do so . . ."). Thus, our courts have found that a defendant cannot claim self-defense when his aggressive conduct or threat provokes a confrontation, and he does not withdraw. *See, e.g., State v. Lujan*, 136 Ariz. 102, 105 (1983) (finding defendant's verbal threat "provoked any threatened use of force" such that "the trial court did not err in refusing to instruct on self-defense"); *State v. Williams*, 132 Ariz. 153, 156 (1982) (finding that defendant was not entitled to self-defense instruction when he provoked an encounter by "ripping his commode from the wall, throwing p[or]celain, and setting fires"), *abrogated on other grounds by Carson*, 243 Ariz. at 465-66, ¶¶ 10-11; *State v. Kelly*, 149 Ariz. 115, 117 (App. 1986) (affirming denial of self-defense instruction where the defendant trespassed and defendant's testimony did "not suggest that he was consciously withdrawing from the confrontation or that he had communicated his intent to the victim"); *State v. Sourivathong*, 130 Ariz. 461, 462-63 (App. 1981) (affirming refusal to give self-defense instruction when defendant entered a home "without invitation," then "searched the premises until he located" the victim, and did not attempt to withdraw once the encounter turned physical).

¶32 The rule that one claiming self-defense cannot provoke the encounter is especially applicable in the context of a home intruder:

But it is not and never has been the law, even in Arizona, that a man who is a trespasser and in a place where he has no right to be may stand his ground and slay his assailant, and still claim self-defense, when by leaving such place he might avoid the conflict. Under the undisputed evidence in this case, defendant was in a place where he had no right to be, that he had been warned by the owners to stay away from, and at a time and under circumstances which made his presence utterly inexcusable. It was certainly his duty under such circumstances to avoid a conflict, if it were possible to do so without endangering his own life or bodily safety; and, if he failed to fulfill that duty, he was in no position to claim the killing was in self-defense.

*Macias v. State*, 36 Ariz. 140, 157-58 (1929) (citation omitted); *see State v. Noriega*, 142 Ariz. 474, 482 (1984) (affirming denial of self-defense instruction where defendant burglarized a home and did not attempt to withdraw other than "to threaten deadly force to escape from the scene of a crime with stolen property"), *overruled on other grounds by State v. Burge*, 167 Ariz. 25, 28 n.7 (1990); *Kelly*, 149 Ariz. at 117 ("Similarly, the defendant in this case was convicted of the crime of trespass, which shows he provoked the altercation and cannot now claim self-defense.").

¶33        If the use of physical force is unjustified under § 13-404, it is inherently unjustified under § 13-405. A.R.S. § 13-405(A)(1)-(2); *Carson*, 243 Ariz. at 465, ¶ 9. Consequently, "[w]hen it is uncontroverted that the accused was at fault in provoking the difficulty which necessitated the defensive use of force, the court should usually refuse to instruct on self-defense." *Sourivathong*, 130 Ariz. at 463. These principles hold even when the other person's responsive use of force is unlawful. *Williams*, 132 Ariz. at 156; *see* A.R.S. § 13-404(B)(3).

¶34        In his testimony, Jaynes demonstrated that he provoked the altercation. At trial, Jaynes acknowledged that he (1) had previously left a threatening voicemail message on E.R.'s phone; (2) entered E.R.'s home without permission; (3) engaged in a combative and emotional confrontation with K.P. in which he demanded that she leave with him; and, after K.P. declined to leave, (4) advanced into E.R.'s backyard; (5) moved to within three feet of E.R.; and (6) confronted E.R. and demanded E.R. leave him and K.P. alone. *Supra* ¶¶ 2-9, 13. Even if, as Jaynes testified, E.R. pulled a gun from his pocket when Jaynes advanced on him, Jaynes testimony shows he provoked the encounter and did not attempt to

withdraw from the situation, nor communicate any intent to do so. *See supra* ¶¶ 31-32 (collecting cases).

**¶35** Thus, even if the jury accepted Jaynes's version of the events, no reasonable juror could have failed to find that Jaynes's conduct provoked the encounter with E.R. Nor does Jaynes point to, or the record show, any other evidence that he withdrew from the encounter with E.R. or communicated any intent to do so. Separate from any *Ewer* error, the superior court properly instructed the jurors that a defendant is not justified in the use or threat of physical force when the defendant provoked the encounter.

**¶36** Under these circumstances, we are convinced beyond a reasonable doubt that the *Ewer* error did not contribute to the verdict. Accordingly, Jaynes is not entitled to a new trial.

## II. Flight Instruction.

**¶37** Jaynes next protests the flight instruction, asserting the State presented insufficient evidence "demonstrating the kind of 'eluding' behavior necessary to justify" it. The decision to give a flight instruction is reviewed for an abuse of discretion. *State v. Parker*, 231 Ariz. 391, 403, ¶ 44 (2013).

**¶38** A flight instruction is proper when the State presents evidence of a defendant's post-crime conduct "from which jurors may infer 'consciousness of guilt for the crime charged.'" *Id.* (quoting *State v. Edwards*, 136 Ariz. 177, 184 (1983)). More specifically, to warrant such an instruction, the evidence must support a reasonable inference that (1) the defendant engaged in open flight or attempted flight, "such as the result of an immediate pursuit"; or (2) absent open flight, the defendant concealed or attempted to conceal evidence. *State v. Speers*, 209 Ariz. 125, 132, ¶ 28 (App. 2004) (quoting *State v. Smith*, 113 Ariz. 298, 300 (1976)).

**¶39** "[M]erely leaving the scene or engaging in travel is not sufficient to support the giving of a flight instruction." *Id.* Nor does a missing weapon automatically entitle the State to such an instruction. *State v. Ceja*, 113 Ariz. 39, 41 (1976). Instead, the key inquiry is whether, under the case's facts, "the defendant engaged in some 'eluding' conduct that either was an attempt to prevent apprehension, or was an attempt to postpone apprehension in order to dispose of or conceal evidence that could tie him to the crime," thereby revealing a consciousness of guilt for the charged offenses. *State v. Cutright*, 196 Ariz. 567, 570, ¶ 12 (App. 1999), *overruled on other grounds by State v. Miranda*, 200 Ariz. 67, 68-69, ¶¶ 4-5

(2001); *see State v. Fulminante*, 193 Ariz. 485, 494, ¶ 27 (1999) (noting false or misleading statements to police tend to "show[] consciousness of guilt").

**¶40**       As described above, the record contains evidence that Jaynes was the last person who possessed the gun; the gun was never recovered; Jaynes asked E.R. to participate in a cover-up; and Jaynes traveled to a remote area after the shooting.  This evidence permitted a reasonable inference that Jaynes left the scene with the gun and took it to another location so that he could hide it from the police.  Although Jaynes posits several innocent reasons for his conduct, alternative explanations for a defendant's post-crime behavior do not preclude a flight instruction. *Parker*, 231 Ariz. at 404, ¶ 50.  Therefore, the superior court did not abuse its discretion by giving the flight instruction.

## CONCLUSION

**¶41**       We affirm.



AMY M. WOOD • Clerk of the Court
FILED:    AA

12