IN THE

# ARIZONA COURT OF APPEALS

DIVISION TWO

---

THE STATE OF ARIZONA,
*Appellee*,

*v.*

WHYTTE DRAGUN DUNCAN,
*Appellant*.

No. 2 CA-CR 2022-0090
Filed April 19, 2024

---

Appeal from the Superior Court in Pima County
No. CR20195676001
The Honorable James E. Marner, Judge

**REVERSED AND REMANDED**

---

COUNSEL

Kristin K. Mayes, Arizona Attorney General
Alice M. Jones, Deputy Solicitor General/Section Chief of Criminal Appeals
By Jacob R. Lines, Assistant Attorney General, Tucson
*Counsel for Appellee*

Sherick Law Office P.C., Tucson
By Steven P. Sherick

and

Adam N. Bleier P.C., Tucson
By Adam N. Bleier
*Counsel for Appellant*

**OPINION**

Judge Eckerstrom authored the opinion of the Court, in which Presiding Judge Brearcliffe and Judge Kelly concurred.

E C K E R S T R O M, Judge:

¶1      Whytte Duncan placed a spy camera in a bathroom to secretly record the teenaged foster daughters living in his house. He appeals his convictions and sentences arising from that conduct. Specifically, Duncan challenges the factual and legal sufficiency of his convictions for attempted or completed sexual exploitation of a minor, as well as the trial court's denial of his motion to suppress. We reject his sufficiency arguments. However, because the court erred in part in denying Duncan's motion to suppress, and because the state has failed to establish that the error was harmless as to any of the counts, we reverse Duncan's convictions and sentences and remand for a new trial.

**Factual and Procedural Background**

¶2      We view the facts, most of which are undisputed, in the light most favorable to upholding the jury's verdicts, resolving all reasonable inferences against the defendant. *See State v. Hood*, 251 Ariz. 57, n.1 (App. 2021). In 2017 and 2018, Duncan placed a USB wall charger containing a hidden digital video recorder in one of the two bathrooms in his house. The camera in the device captured videos from a fixed position of female foster children undressing, showering, and sitting on the toilet.

¶3      One night in mid-2018, one of those foster children—sixteen-year-old K.K.—examined the charger device and realized it contained a hidden camera. She removed the camera's micro secure data card ("SD card") and attempted to view its contents on her tablet, without success. She called her Department of Child Safety ("DCS") caseworker, reporting that she believed she had found a camera in her bathroom and was "very concerned about it." She then left the house, taking the device—complete with camera and SD card—with her. She gave it to her caseworker later that day. DCS called the police and turned the device over to the responding patrol officer.

¶4      Seven days later, Detective Dan Barry of the Tucson Police Department examined the device. He first removed the SD card and placed

it into a "write-blocking device," which allowed him to view the contents of the card without writing any data onto it. This revealed videos taken in the bathroom at Duncan's house, including of K.K. showering and using the toilet. Barry then used forensic software to view deleted files in the SD card's "unallocated" space, which also contained videos of K.K. in the bathroom. Barry had not obtained a warrant to conduct this search.

¶5　　　　The discovery of the videos led to a forensic interview of K.K. and the issuance of a search warrant for Duncan's home. The search led to the discovery on his cell phone of nude and semi-nude images of K.K. and two additional foster children who had previously lived at Duncan's house: K.M, who had been under fifteen years old at the time, and J.D. Most of the images appeared to be still screenshots or snapshots derived from videos captured in the bathroom where K.K. had found the spy camera.

¶6　　　　A grand jury charged Duncan with thirty counts. The first nine involved attempted or completed sexual exploitation of a minor, K.K.[1] Counts one through four were based on the deleted videos Detective Barry retrieved from the unallocated space on the SD card in Duncan's spy camera using the forensic software. Counts five through nine were based on the videos he found in the allocated space on the SD card. The remaining counts were based on the images found on other electronic devices during the search of Duncan's residence. Counts ten through twenty-seven charged sexual exploitation of a minor[2]—K.K., K.M., and J.D.—with the three involving K.M. alleging that the victim had been under fifteen years old at the time each crime was committed. The final three counts alleged surreptitious photographing, videotaping, filming, or digitally recording or viewing of J.D. after she was no longer a minor.

¶7　　　　At the conclusion of a four-day trial, a jury found Duncan guilty as charged.[3] Duncan filed a motion requesting a new trial, which the trial court denied after a hearing. The court then sentenced Duncan to

---

[1]The six counts of attempted sexual exploitation of a minor were charged in the alternative as surreptitious photographing, videotaping, filming, or digitally recording or viewing.

[2]The trial court dismissed one of these counts before trial, on the state's motion.

[3]After the jury returned its verdicts finding Duncan guilty of the six charged counts of attempted sexual exploitation of a minor, K.K., the trial court granted the state's motion to dismiss without prejudice the six alternative counts of surreptitious recording.

consecutive and concurrent prison terms totaling 90.5 years. This appeal followed. We have jurisdiction pursuant to A.R.S. §§ 12-120.21(A)(1), 13-4031, and 13-4033(A).

## Sexual Exploitation Charges

¶8        Duncan challenges both the factual and legal sufficiency of his twenty-six convictions for attempted or completed sexual exploitation of a minor.[4] Quoting A.R.S. § 13-3551(5), he contends there was "insufficient evidence presented at trial that the images were made 'for the purposes of sexual stimulation.'" He also argues that the sexual exploitation statute, A.R.S. § 13-3553(A)(1)-(2)—when combined with the definition of "exploitive exhibition" established at § 13-3551(5)—is impermissibly "overbroad as applied to the facts of this case because it does not meet the constitutional threshold required for the recording or the possession of child pornography."

### Factual Sufficiency

¶9        At trial, after the presentation of all evidence, Duncan moved for a judgment of acquittal under Rule 20(a), Ariz. R. Crim. P. Finding that the state had presented substantial evidence for convictions on all twenty-nine counts, the trial court denied the motion.

¶10        On appeal, Duncan contends "the state failed to present suff[i]cient factual evidence to convict [him] of attempted or completed acts of sexual exploitation of a minor." Sufficiency of the evidence is a question of law requiring *de novo* review. *State v. West*, 226 Ariz. 559, ¶ 15 (2011). Viewing the evidence in the light most favorable to sustaining the jury's verdicts, and resolving all inferences against the defendant, we must determine whether the state presented evidence that "reasonable persons could accept as sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *State v. Spears*, 184 Ariz. 277, 290 (1996). In so doing, we may not "reweigh evidence or reassess the witnesses' credibility." *State v. Buccheri-Bianca*, 233 Ariz. 324, ¶ 38 (App. 2013). If jurors could reasonably differ as to whether the evidence establishes the necessary facts, that evidence is sufficient as a matter of law. *See State v. Davolt*, 207 Ariz. 191, ¶ 87 (2004).

---

[4]On appeal, Duncan does not raise these challenges with regard to his three convictions for surreptitious photographing, videotaping, filming, or digitally recording or viewing of an adult, J.D.

¶11 We test the sufficiency of the evidence against the statutorily required elements of the offense. *State v. Pena*, 209 Ariz. 503, ¶ 8 (App. 2005). Here, the state bore the burden of presenting evidence sufficient for a rational jury to conclude, beyond a reasonable doubt, that Duncan knowingly recorded, filmed, photographed, duplicated, electronically transmitted, or possessed "any visual depiction" of a minor engaged in "exploitive exhibition," § 13-3553(A)(1)-(2), which means "the actual or simulated exhibition of the genitals or pubic or rectal areas of any person for the purpose of sexual stimulation of the viewer," § 13-3551(5). As we have explained, this language "means that the viewer intends the [video or] photograph be used for sexual stimulation, rather than that the minor intends to sexually stimulate the viewer." *State v. Chandler*, 244 Ariz. 336, ¶ 7 (App. 2017).

¶12 Duncan contends there was "insufficient evidence of [his] sexual intent." We cannot agree.[5]

¶13 The jury saw a photograph of the relevant bathroom in Duncan's house, including where the charger device was placed, across from the shower. K.K. testified that, before she discovered that the device was a hidden camera, she would "constantly move it out of the bathroom and charge it somewhere else or put it on [Duncan's] desk," but when she "would go back the next time, it would be in the bathroom again." Duncan told her to leave it in the bathroom or there would be consequences. K.K. also explained that, after she realized the device was a camera and fled the house with it, Duncan texted her asking where it was.

¶14 Detective Barry testified that the spy camera could be connected to other devices and controlled using a cell phone. The jury

---

[5]As discussed below, we conclude the trial court erred in denying Duncan's motion to suppress the evidence gathered during the warrantless search of his charger device and the SD card it contained. We therefore confine our assessment of the factual sufficiency to the evidence gathered separately from that warrantless search. Our determination that such evidence was sufficient to allow reasonable jurors to find Duncan guilty of attempted and completed acts of sexual exploitation of a minor is a separate consideration from whether the state has carried its burden to establish that the court's partial error in denying the motion to suppress "was harmless by presenting overwhelming evidence of [Duncan]'s guilt." *State v. Sanchez-Equihua*, 235 Ariz. 54, ¶ 28 (App. 2014) (state's conclusory harmlessness argument insufficient where "evidence, although sufficient, was not overwhelming").

heard testimony that, on the cell phone found in Duncan's home, police found an application that looked like a calculator but was actually a hidden, password-protected way to store files. Once opened with Duncan's password, the app revealed a folder called "Sparky." It contained numerous images of K.K., K.M., and J.D. nude or in a state of undress in a bathroom setting. Most of the images in the secret folder appeared to be still screenshots or snapshots derived from videos taken in the bathroom where K.K. had found the camera.

¶15        Duncan's digital devices also revealed that he had researched hidden cameras and spy cameras, and browsed and purchased one or more such cameras through Amazon. His browser history also indicated that, the day after K.K. left with his spy camera, Duncan conducted research on how to hide or delete his Amazon browsing history.

¶16        Viewed in the light most favorable to sustaining the jury's verdicts, and resolving all inferences against Duncan, *see Spears*, 184 Ariz. at 290, the foregoing evidence permitted reasonable jurors to conclude that Duncan had secretly recorded the minor victims in states of undress, captured still images from those videos, and saved them to a hidden, password-protected folder on his cell phone "for the purpose of [his own] sexual stimulation," § 13-3551(5). Indeed, this is the common-sense conclusion to be drawn from Duncan's behavior. Neither at trial nor on appeal has Duncan provided any alternative explanation for why he behaved in this way.

¶17        Duncan attempts to contrast this case with *Chandler*, in which the defendant also set up a hidden camera to record young women in the bathroom, saving nude videos to a computer hard drive. 244 Ariz. 336, ¶ 2. There, the defendant "admitted to thinking about masturbating while watching [the] videos." *Id.* ¶ 8. Duncan highlights this distinction, arguing "there is no similar evidence from Mr. Duncan or any other source as to his motivation." But we recognize "no distinction in the probative value of direct and circumstantial evidence," and "[a] conviction may be sustained on circumstantial evidence alone." *State v. Green*, 111 Ariz. 444, 446 (1975). The evidence here was sufficient to allow reasonable jurors to find Duncan guilty of attempted and completed acts of sexual exploitation of a minor, and the trial court properly rejected his Rule 20 motion on that ground.

**Legal Sufficiency**

¶18        Duncan also contends the trial court abused its discretion in denying his Rule 20 motion because § 13-3553(A)(1)-(2) and § 13-3551(5) "are unconstitutionally overbroad as applied to the facts of this case." In

particular, he argues that the First Amendment to the United States Constitution [6] "limit[s] the extent to which the State may criminalize materials that depict child nudity," allowing such criminalization only for "images of minors engaged in sexual conduct" or "lewd images of the genital, pubic or rectal areas of minors."

¶19        As the state points out, Duncan did not raise this issue before the trial court.  Rather, he raised a due process challenge to any counts predicated on images of a victim's "rectal area"—of which there were actually none.  Nowhere did he argue, as he now does on appeal, that state statutes prohibiting the sexual exploitation of minors may constitutionally target materials that do not depict sexual conduct only if they contain a lewd or lascivious depiction of nudity.  As such, we review only for fundamental and prejudicial error.  *See State v. Clark*, 249 Ariz. 528, ¶ 12 (App. 2020) (defendant who did not challenge sufficiency of evidence on certain counts when moving for judgment of acquittal under Rule 20 "forfeited relief for all but fundamental and prejudicial error" as to those counts); *State v. Brock*, 248 Ariz. 583, ¶ 21 (App. 2020) (when defendant did not object to legal standard applied by trial court in denying Rule 20 motion, appellate review limited to fundamental, prejudicial error).[7]

¶20        The parties agree that the videos and images at issue in this case do not involve sexual conduct.  As Detective Barry put it at trial, they depict minors doing "[t]hings people would normally do in the bathroom": using the toilet, showering, and undressing to do so.  To this extent, Duncan is correct that the videos and images themselves "simply depict nudity of adolescents."

¶21        We cannot agree, however, with Duncan's arguments equating this case with those criminalizing the mere possession of such images.  Duncan's formulations ignore the gravamen of the sexual exploitation charges against him:  that his creation and reproduction of the

---

[6]Duncan also references article 2, § 6 of the Arizona Constitution, arguing in passing that it "has been held to guarantee greater free speech rights than the First Amendment."  Because Duncan's briefs fail to develop any argument based on this separate constitutional provision, we do not address it.  *See State v. Trujillo*, 248 Ariz. 473, n.1 (2020).

[7]Duncan disagrees, contending we must review his claim *de novo*.  But even under his preferred standard of review, Duncan would bear the burden of overcoming a strong presumption that the challenged statutes are constitutional.  *See Brock*, 248 Ariz. 583, ¶ 10.

videos and images itself sexually exploited the minors. Duncan was not prosecuted for merely "possessing" non-pornographic images of adolescents. Rather, he hid a spy camera in the bathroom used by the foster children living in his house to secretly record their private behaviors and undressed bodies. He then captured and saved images from those videos to other devices. And, as discussed above, the jury reasonably concluded that he did so "for the purpose of [his own] sexual stimulation" as the viewer. § 13-3551(5).

¶22 As we have previously explained, "§ 13-3553 does not criminalize conduct involving 'merely nude' images of minors." *Brock*, 248 Ariz. 583, ¶ 14; *see also Chandler*, 244 Ariz. 336, ¶¶ 2, 8 (interpreting statutes to apply in cases involving analogous facts "will not lead to criminalization of innocent pictures or videos in which a child happens to be nude"). Rather, the definition of "exploitive exhibition" provided at § 13-3551(5) "substantially circumscribes" the scope of § 13-3553. *Brock*, 248 Ariz. 583, ¶ 14. As we have held, that provision excludes nude images of minors that are created for non-sexual purposes. *Id.*

¶23 Although this provision protects the innocent creator or possessor of non-pornographic nude images of minors, Duncan is correct that the sexual motivation requirement is incomplete in rendering our sexual exploitation statutes constitutional. Both the United States Supreme Court and this court have established that "a possessor's subjective intent" is insufficient to, as Duncan puts it, "transmute an image of mere nudity into child pornography." *See, e.g.*, *United States v. Williams*, 553 U.S. 285, 288, 290, 301 (2008) (federal statute criminalizing pandering of visual depictions of minors engaging in "sexually explicit conduct" not implicated by "harmless picture of a child in a bathtub" offeror erroneously believes constitutes lascivious exhibition of genitals, or where person "offers nonpornographic photographs of young girls to a pedophile" who "secretly expects that the pictures will contain child pornography"); *State v. Gates*, 182 Ariz. 459, 465-66 (App. 1994) ("When a picture does not constitute child pornography, even though it portrays nudity, it does not become child pornography because it is placed in the hands of a pedophile, or in a forum where pedophiles might enjoy it." (quoting *United States v. Villard*, 885 F.2d 117, 125 (3d Cir. 1989))); *see also Osborne v. Ohio*, 495 U.S. 103, 114 (1990) (states may not "penaliz[e] persons for viewing or possessing innocuous photographs of naked children"). As a result, Arizona's sexual exploitation statute would remain unconstitutional if applied to criminalize the mere possession of non-lewd, nude videos or images of minors, even when the possession may be sexually motivated. *See* § 13-3553(A)(2) (criminalizing, *inter alia*, possession of visual depictions of minors engaged in exploitive

exhibition); *see also State v. Hazlett*, 205 Ariz. 523, ¶ 28 (App. 2003) (acknowledging this caveat to constitutionality of § 13-3553). But Arizona may criminalize conduct by those who take actions to create such videos or images to sexually exploit the minors depicted in them. Under the latter circumstance, the criminal act exists not in the content of the videos or images, but in the defendant's affirmative actions in recording, filming, or photographing the minors and reproducing the resulting images with sexual motivation. *See* § 13-3553(A) (criminalizing a defendant's affirmative actions in exploiting children); § 13-3551(5).

¶24        So applied, "the challenged statute does not constrain protected expression" and "is not overbroad." *Brock*, 248 Ariz. 583, ¶ 14. To the contrary, by limiting the universe of illegal behavior in this way, our legislature ensured compliance with the constitutional requirement that the prohibited conduct be "adequately defined by the applicable state law," with the category of forbidden material "suitably limited and described." *New York v. Ferber*, 458 U.S. 747, 764 (1982); *see also Brock*, 248 Ariz. 583, ¶ 11.

¶25        In sum, § 13-3551(5) and § 13-3553(A)(1)-(2) are not constitutionally overbroad as applied to the facts of this case. Duncan took affirmative actions to create the videos and images in question for the purposes of sexually exploiting the minors depicted. The trial court committed no error, much less fundamental error, in denying his Rule 20 motion on the legal basis for the twenty-six counts of attempted or completed acts of sexual exploitation of a minor.

## Motion to Suppress

¶26        Duncan sought to suppress the evidence obtained by the state as a result of the warrantless search of his charger device and its SD card, including the images subsequently discovered on other electronic devices in his home through the execution of the search warrant. After an evidentiary hearing, the trial court denied the motion in full. Duncan now challenges that ruling on appeal.

¶27        We review a trial court's denial of a motion to suppress for an abuse of discretion, "considering the facts in the light most favorable to sustaining the ruling." *State v. Valenzuela*, 239 Ariz. 299, ¶ 9 (2016). We consider only the evidence presented at the suppression hearing. *Id.* ¶ 3. We must affirm if the ruling is legally correct for any reason. *State v. Boteo-Flores*, 230 Ariz. 551, ¶¶ 7-8 (App. 2012).

**Warrantless Search of the SD Card**

¶28　　　At the suppression hearing, the trial court accepted Duncan's admission that, at all times relevant to this case, he was the exclusive owner of both the charger device and the SD card it contained.　The court then concluded that Detective Barry's search of the SD card qualified as a search under the Fourth Amendment, such that a warrant was required "absent exigent circumstances or a legally recognized exception."　This conclusion "is consistent with United States Supreme Court and Arizona Supreme Court jurisprudence making clear that data derived from electronic devices cannot be searched without a warrant."　*Hamberlin v. State ex rel. Ariz. Game & Fish Dep't*, 249 Ariz. 31, ¶¶ 25, 28 (App. 2020) (to search data from even properly seized electronic equipment, state "must first develop evidence sufficient to establish probable cause and then get a warrant").

¶29　　　The state challenges the trial court's characterization of Detective Barry's examination of the contents of Duncan's SD card as "a trespass into defendant's personal papers and effects."　It insists "there was no trespass by a government agent" because "K.K. took the device and removed the SD card," whereas Barry did not "physically" occupy or intrude on any constitutionally protected area.[8]　The state thus contends that *United States v. Jones*, 565 U.S. 400 (2012), "does not apply."　Instead, it frames the relevant question as whether Duncan had a "reasonable expectation of privacy in the spy camera or the SD card inside of it"—an articulation of a test derived from Justice Harlan's concurrence in *Katz v. United States*, 389 U.S. 347, 360 (1967).

¶30　　　The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."　U.S. Const. amend. IV.　We have no difficulty determining that Duncan's charger device qualifies as a personal "effect,"

---

[8]It is undisputed that K.K., and not a government actor, removed the charger device and its SD card from Duncan's home.　Given that no warrantless search of a home occurred in this case, we need not address Duncan's passing argument that our state constitutional provisions are "specific in preserving the sanctity of homes."　*See State v. Huerta*, 223 Ariz. 424, ¶ 18 (App. 2010) (Arizona Constitution occasionally "found to afford a defendant greater privacy protections" than U.S. Constitution, but only in "exceedingly narrow" circumstances when "privacy of a person's home has been invaded" by government); *State v. Juarez*, 203 Ariz. 441, ¶ 15 (App. 2002) (except in home search context, protections of Arizona Constitution concomitant with those of federal constitution).

with the videos saved on its SD card being a data-based equivalent to "papers." *See State v. Jean*, 243 Ariz. 331, ¶ 9 (2018) ("vehicle is an 'effect' under the Fourth Amendment"); *see also, e.g., People v. Gingrich*, 862 N.W.2d 432, 436-37 (Mich. Ct. App. 2014) ("can hardly be doubted" that personal laptop computer "storing personal information in the form of digital data must be considered defendant's 'effect' under the Fourth Amendment," and accessing its data to obtain information qualifies as "search"); *Brackens v. State*, 312 S.W.3d 831, 837 (Tex. Ct. App. 2009) ("Fourth Amendment protection afforded to closed computer files and hard drives is similar to the protection afforded to a person's closed containers and closed personal effects"); *United States v. Barth*, 26 F. Supp. 2d 929, 936 (W.D. Tex. 1998) (same, and analogizing to office files).[9] The state maintains that it did not intrude on any personal property to obtain information. *See Florida v. Jardines*, 569 U.S. 1, 5 (2013) ("When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a search within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" (quoting *Jones*, 565 U.S. at 406 n.3)). We cannot agree.

¶31 To examine its contents, Detective Barry physically removed the SD card from the USB charger and inserted it into a device attached to his computer. He then clicked on the electronic folder that appeared on his screen and viewed its contents, proceeding then to use special forensic software to click through and view additional deleted items. We agree with the trial court that this was "the 21st century version of opening a closed briefcase or file cabinet and pulling out its contents and looking at them." This case does not present the more complicated problem of information or data that has been shared, transmitted, or intercepted. *See, e.g., Katz*, 389 U.S. at 348 (involving FBI's attachment of electronic listening and recording device to outside of public telephone booth from which defendant placed calls); *State v. Mixton*, 250 Ariz. 282, ¶ 1 (2021) (regarding internet user's IP address and subscriber information voluntarily provided to internet service provider). We remain in the domain of personal physical "effects" that were indisputably searched by the state. *See United States v. Ackerman*, 831 F.3d 1292, 1304, 1308 (10th Cir. 2016) ("rummaging through private papers or effects would seem pretty obviously a 'search,'" whether mail in question

---

[9]As such, we need not address the parties' arguments regarding the extent to which the device in question is analogous to a cell phone or computer hard drive, either in terms of its capabilities and contents or any resulting privacy interests.

is physical mail or email, and "pretty intuitive" that opening and examining a party's email qualifies as a "search").[10]

**¶32**        Detective Barry testified that no exigent circumstances prevented him from obtaining a warrant prior to searching the SD card. Thus, as the trial court correctly concluded, a warrant was required unless "one of a few well-established exceptions applie[d]." *Valenzuela*, 239 Ariz. 299, ¶ 10 (warrantless search "per se unreasonable under the Fourth Amendment" absent qualifying exception).

### Abandonment

**¶33**        The trial court denied Duncan's motion to suppress on the ground that he had abandoned the charger device and retained no privacy interest in it by the time Detective Barry viewed the contents of its SD card. Whether a defendant has abandoned property is a factual determination we review for "clear and manifest error." *State v. Huerta*, 223 Ariz. 424, ¶ 4 (App. 2010). Defendants have abandoned property when they have "voluntarily discarded, left behind, or otherwise relinquished [their] interest in the property in question" so that they can "no longer retain a reasonable expectation of privacy with regard to it at the time of the search." *Id.* ¶ 5 (quoting *State v. Walker*, 119 Ariz. 121, 126 (1978)). We determine whether this has occurred by objective factors. *Id.* Specifically, we consider, under the totality of the circumstances, *id.* ¶ 15, whether the defendant's words or actions would have caused "a reasonable person in the searching officer's position to believe that the property was abandoned," *id.* ¶ 5 (quoting *People v. Pereira*, 58 Cal. Rptr. 3d 847, 852-53 (Ct. App. 2007)).

---

[10]We need not separately apply *Katz*'s "reasonable expectation of privacy" test. *See Jardines*, 569 U.S. at 5 (*Katz* "does not subtract anything" from Fourth Amendment's protections when government does engage in physical intrusion of constitutionally protected area); *see also Ackerman*, 831 F.3d at 1307 ("government conduct can constitute a Fourth Amendment search *either* when it infringes on a reasonable expectation of privacy *or* when it involves a physical intrusion (a trespass) on a constitutionally protected space or thing ('persons, houses, papers, and effects') for the purpose of obtaining information," and fact that "government's conduct doesn't trigger *Katz* doesn't mean it doesn't trigger the Fourth Amendment"); *Lyall v. City of Los Angeles*, 807 F.3d 1178, 1186 n.8 (9th Cir. 2015) ("[A] person may have Fourth Amendment standing to challenge a search based on his possessory interest in property independent of any reasonable expectation of privacy in the property.").

¶34     The state does not defend the trial court's finding of abandonment on appeal. Duncan contends that none of the facts before the court reasonably supported a finding that he had abandoned the charger device or the SD card it contained. We agree.

¶35     In deeming the device abandoned, the trial court emphasized that Duncan had placed it in a bathroom in a common area of his home used by other residents and guests. The court further posited that, as a foster home, Duncan's residence was subject to state scrutiny, including quarterly inspections and at least one unannounced monitoring inspection per year. It defies common sense to assert that a person abandons his property by placing it somewhere in his own home. Nor does the possibility of state inspection render personal property abandoned.

¶36     The trial court also noted that K.K. "had previously unplugged the device and moved it to defendant's desk area and defendant responded by placing it back in the common bathroom." Nothing about this intentional movement of the device to a specific location in the home evinces an intent to abandon it. Indeed, at the suppression hearing, the court was advised that, after Duncan moved the device back into the bathroom, K.K. left it because "she didn't want to argue with him or get in trouble for asking why it was in there."

¶37     Finally, the trial court observed that, after a series of text messages with K.K. on the day she left and removed the device from the bathroom, Duncan "made no further efforts to track it down or recover it" and did not contact DCS or the police department. The court also observed that "[t]he device was not examined for 7 days thereafter." However, in his text exchange with K.K.—which he initiated immediately after he noticed the device was no longer in the bathroom—Duncan repeatedly inquired as to where his "battery," "charger," or "box" had gone. K.K. responded that she had left the "battery" on a chair in the house and otherwise— understandably, but importantly—feigned ignorance about the location of the device Duncan was actively seeking. Having been reassured that K.K. had not removed the missing device from his home, Duncan had no reason to take any further steps to assert his ownership interest in it. Even if he did not believe K.K.'s assertion that she had left the device in his home, there is no evidence that he knew where it was. Neither DCS nor the police contacted Duncan about the device. And even if he suspected that K.K. had turned the device over to DCS or the police, affirmatively approaching either to inquire about his property would have presented "a constitutional dilemma of choosing between his privacy interests and his right against self-incrimination," given the context in which either entity would have come into possession of the device. *Huerta*, 223 Ariz. 424, ¶ 16

(acknowledging "no abandonment when defendant forced to choose between expectation of privacy and right against self-incrimination").

¶38 The trial court contrasted Duncan's lack of follow-up in the seven days preceding the search of the SD card with his partner's "extensive and ultimately successful" pursuit of the cell phone K.K. took when she left the foster home. But in the latter context, K.K. had acknowledged having the phone, making follow-up attempts to retrieve it from her reasonable. She made no such acknowledgement to Duncan or his partner with regard to the device in question here.

¶39 Viewed in their totality, these circumstances do not support the conclusion that by the time of the search, Duncan had abandoned the charger device or the spy camera and SD card it contained. *See id.* ¶¶ 5, 15. Nothing in his words or actions could have caused a reasonable person in the searching officer's position to believe that Duncan had relinquished his ownership interest in the property. *See id.* ¶ 5. To the contrary, in his last exchange with K.K., he repeatedly asserted that the item belonged to him. Notably, at no point during the suppression hearing did Detective Barry articulate a belief that Duncan had abandoned the device. Having no evidence before it demonstrating that Duncan had voluntarily relinquished his interest, the trial court erred in finding that Duncan had abandoned the charger device at the time its SD card was searched. *See id.* ¶ 4.

## Apparent Authority to Consent

¶40 The state argues that "K.K. had apparent authority to give the SD card to police and consent to its search." In particular, the state contends that "because Duncan left his spy camera in the bathroom that K.K. and others used, with no limitation on their access to it, K.K. had apparent authority to consent to the search of the SD card and no warrant was necessary to search it." The state also argues that, by leaving the charger device in a place K.K. could access it—which she repeatedly did, first by removing it from the bathroom and placing it on Duncan's desk, and then by removing the SD card, attempting to view its contents, removing the device from the home, and providing it to DCS—"Duncan assumed the risk that K.K. could allow someone else to have the contents of the camera."

¶41 The theory articulated by the state on appeal is consistent with Detective Barry's explanation at the suppression hearing for why he did not obtain a warrant before searching the SD card. He testified as follows:

It was because the child brought it to me. It was placed in her room for a specific area. She had dominion and control over that item and I didn't think about getting a warrant because she was the one who provided it. She was the one who had it. It was put into her personal space where she could have even used the item.

¶42  "One exception to the warrant requirement is a search conducted with consent." *Valenzuela*, 239 Ariz. 299, ¶ 11; *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). This includes situations in which "a third party with 'common authority over or other sufficient relationship to the premises or effects sought to be inspected' voluntarily consents to the search." *State v. Jones*, 185 Ariz. 471, 480 (1996) (quoting *United States v. Matlock*, 415 U.S. 164, 171 (1974)).

¶43  "[W]hen determining whether common authority exists, the focus is on apparent authority, rather than actual authority." *Id.* at 481; *see also Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990). We assess this question by an objective standard: whether the facts available to an officer at the time of a search would permit a person of reasonable caution to believe that the consenting third party had the authority to authorize the search. *Rodriguez*, 497 U.S. at 188. We must therefore determine whether, based on the information available to him at the time of the search, Detective Barry could reasonably have concluded that K.K. had the right to permit inspection of the SD card. *See Matlock*, 415 U.S. at 171 n.7 (authority justifying third-party consent depends on whether "reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched"); *see also State v. Tucker*, 118 Ariz. 76, 78 (1978) (adopting language from *Matlock*).

¶44  Common authority hinges on whether there is apparent "mutual use of the property by persons generally having joint access or control for most purposes." *Matlock*, 415 U.S. at 171 n.7; *see also Rodriguez*, 497 U.S. at 188; *State v. Heberly*, 120 Ariz. 541, 543-44 (App. 1978). Here, the search in question was of a piece of property—the SD card contained in the spy camera—not the search of certain premises.[11] "When the property to

---

[11] For this reason, K.K.'s use of the bathroom where the charger device was located is not the operative question. A party's shared use of a space does not necessarily imply shared use of, or the right to consent to the search of, all property contained within that space. *See, e.g., State v. Bentlage*, 192 Ariz. 117, ¶¶ 3-6 (App. 1998) (passenger, who owned vehicle, lacked

be searched is an object or container, the relevant inquiry must address the third party's relationship to the object." *United States v. Andrus*, 483 F.3d 711, 717 (10th Cir. 2007); *see also Heberly*, 120 Ariz. at 544 (applying *Matlock/Tucker* test to third party's consent to search of defendant's suitcase).

¶45        The information available to Detective Barry at the time of the search indicated that the device belonged exclusively to Duncan. That information, contained in the patrol officer's initial report, did not reasonably indicate that Duncan had allowed K.K. to jointly use or possess the device or to exercise material control over it. K.K. had never suggested the device belonged to her. Rather, she had delivered it to DCS because she had found it in her bathroom, knew it was not hers, was suspicious about its purpose, and had been unable to access its contents. Barry was informed that, when K.K. had previously attempted to remove it from her bathroom, Duncan had overridden that attempt and returned it. K.K. had acquiesced, deciding to leave the device in her bathroom because she "didn't want to argue with [Duncan] or get in trouble for asking why it was in there." According to K.K, she did not know at that point that the device contained a camera, much less attempt to use it as such. Moreover, the initial police report reflected that, after K.K. later realized the device was actually a hidden camera and tried to view its contents, she "was not able to gain access to the SD card because it was password protected." This should have cued Barry that Duncan had not given K.K. common authority over it. Finally, the initial report indicated that Duncan had asked K.K. for the device after she left the house and that—far from manifesting a right to use or control it—she had responded that she did not have it and did not know where it was.

¶46        Thus, the information available to Detective Barry did not reasonably suggest that K.K. appeared to have common authority to consent to the search of Duncan's SD card.

### Private Search Doctrine

¶47        Before the trial court, the state argued that no warrant was required for Detective Barry's search of the SD card because K.K., a private actor, had already searched it and Barry did not exceed the scope of K.K.'s search. As we have observed, "once [a] private actor has frustrated 'the original expectation of privacy,' there is no constitutional protection of

---

apparent authority to consent to search of defendant driver's zippered case found under driver's seat).

'governmental use of the now-nonprivate information.'" *State v. Fristoe*, 251 Ariz. 255, ¶ 12 (App. 2021) (quoting *United States v. Jacobsen*, 466 U.S. 109, 117 (1984)).

**¶48** Detective Barry's search of Duncan's device was not rendered constitutional by this doctrine. Although K.K. attempted to do so, she never successfully searched the SD card to view any of its contents. Barry speculated that the card's format made K.K.'s attempt unsuccessful. But we do not anchor the private search doctrine in whether a device could hypothetically have been searched by a private actor. Rather, we must assess which expectations of privacy were actually frustrated by the private party's investigation. *See United States v. Runyan*, 275 F.3d 449, 458-64 (5th Cir. 2001). A private person's unsuccessful exertions to force open the latches on another's briefcase would not forfeit the briefcase owner's privacy interest in its contents. The facts here are analogous. The state has made no argument that K.K. actually discovered any of the contents of the SD card. Therefore, Barry's complete exposure of the contents of the card, including through the use of specialized forensic software, exceeded the scope of K.K.'s fruitless, private search. *See Jacobsen*, 466 U.S. at 122.

**Conclusion**

**¶49** Having identified no legal basis justifying the ruling, *see Boteo-Flores*, 230 Ariz. 551, ¶¶ 7-8, we must conclude that the trial court abused its discretion by denying Duncan's motion to suppress the evidence gathered through the warrantless search of his SD card.

**Fruits of the Search Warrant**

**¶50** Detective Barry included the information gathered from his search of the SD card, along with other information, in the affidavit he submitted to obtain the search warrant for Duncan's residence. The execution of that search warrant resulted in the discovery on Duncan's cell phone of nude and semi-nude images of K.K., K.M., and J.D. captured from videos taken in the bathroom where K.K. had found the spy camera. These additional images formed the bases for counts ten through thirty.

**¶51** When illegally obtained information was included in an affidavit in support of a search warrant, "[t]he proper method for determining the validity of the search . . . is to excise the illegally obtained information from the affidavit and then determine whether the remaining information is sufficient to establish probable cause." *State v. Gulbrandson*, 184 Ariz. 46, 58 (1995). The state must show that the information learned

from the illegal search "did not affect the officer's decision to seek the warrant or the magistrate's decision to grant it." *Id.*

**¶52**        Detective Barry testified that, even without having viewed the contents of the SD card, he "absolutely" would have sought a warrant to search electronics found in Duncan's home. He observed that data from the SD card could be viewed remotely and easily transferred to a cell phone or computer. Having found Barry's testimony credible, the trial court concluded that, with the SD card information excised, the warrant affidavit contained "sufficient facts/probable cause to support" the issuance of the warrant.

**¶53**        On appeal, Duncan challenges this conclusion as an abuse of discretion. He contends the search warrant affidavit "was insufficient without the information obtained from the warrantless search," such that "the fruit of the poisonous tree should have been suppressed."

**¶54**        "Probable cause exists when the facts known to a police officer 'would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present.'" *State v. Sisco*, 239 Ariz. 532, ¶ 8 (2016) (quoting *Florida v. Harris*, 568 U.S. 237, 243 (2013)). The standard is a practical one that depends on the totality of the circumstances. *Id.* "[A]ll that is 'required is the kind of fair probability on which reasonable and prudent people, not legal technicians, act.'" *Id.* (quoting *Harris*, 568 U.S. at 244).

**¶55**        With the information gathered during the warrantless search of the SD card excised from the warrant affidavit,[12] the remaining information was sufficient to justify the issuance of the search warrant. First, it established that a minor living in a foster home had found what she suspected to be a hidden camera in a charging device in the bathroom

---

[12]Duncan argues that only the first paragraph of the search warrant affidavit may be considered toward probable cause because the forensic interview referenced in paragraphs two, three, four, and seven and Detective Barry's open-source online search referenced in paragraph eight both occurred after the warrantless search was conducted. But, as Duncan concedes, the statements from the forensic interview mirror the statements K.K. made to the patrol officer before Barry conducted his search— statements memorialized in a report Barry reviewed at the beginning of his involvement in the case. And Detective Barry testified that he did not recall whether he conducted his online research before or after he searched the SD card.

where she showered. The minor knew that the device belonged to Duncan, who had repeatedly placed it in the bathroom and inquired as to its location after she removed it. The affidavit also advised that an experienced police officer had confirmed that the device was, in fact, a spy camera. The officer, with training in internet crimes against children, confirmed the camera could be accessed remotely via an application downloaded to the user's cell phone. That application would allow for complete control of the camera and the saving of videos to the phone.

**¶56**     This information was sufficient to establish a fair probability that Duncan had committed, at minimum, surreptitious photographing, videotaping, filming, or digital recording or viewing under A.R.S. § 13-3019 and that evidence of that crime or others would be found—as it was—on other electronic devices located in his home. *See Sisco*, 239 Ariz. 532, ¶ 8. We thus conclude that, although the trial court erred in failing to suppress the evidence found through the warrantless search of Duncan's SD card, it did not abuse its discretion by refusing to suppress the evidence obtained through the execution of the search warrant.

**Harmlessness**

**¶57**     "We assess a trial court's erroneous denial of a motion to suppress for harmless error." *Davolt*, 207 Ariz. 191, ¶ 39. This standard of review "places the burden on the state to prove beyond a reasonable doubt that the error did not contribute to or affect the verdict or sentence." *State v. Henderson*, 210 Ariz. 561, ¶ 18 (2005); *see also State v. Glissendorf*, 235 Ariz. 147, ¶ 23 (2014) (once defendant has shown error, burden shifts to state to prove error harmless); *State v. Anthony*, 218 Ariz. 439, ¶ 39 (2008) (state has burden of convincing appellate court that "guilty verdict actually rendered in this trial was surely unattributable to the error" (quoting *State v. Bible*, 175 Ariz. 549, 588 (1993))). The state has not done so here.

**¶58**     During the trial court litigation, the state itself took the position that the erroneously admitted evidence was relevant and probative as to all counts. It provided pretrial notice, pursuant to Rule 404(b) and (c), Ariz. R. Evid., of its intent to present other acts evidence. This included videos and images on various devices that were not the subject of the charged offenses. Most importantly, the state sought a ruling that uncharged videos on the SD card were admissible against Duncan under Rule 404(b) and (c). The trial court agreed, admitting the entire contents of the SD card. It found the evidence relevant to show "*modis operandi*, intent, and absence of mistake" under 404(b). And, it found the evidence admissible under 404(c) to show Duncan's "propensity for sexual aberration, specifically Voyeurism."

19

¶59        On the record before us, the erroneously admitted evidence was indispensable to the convictions on counts one through nine. Those counts were expressly based on videos found through the improper warrantless search of the SD card. The remaining counts involved a different set of images lawfully discovered in Duncan's home through the execution of the search warrant. However, as we have explained above, Duncan's seventeen convictions for sexual exploitation of a minor based on the images found on Duncan's cell phone did not turn exclusively on the content of the particular charged images themselves, but also on his motivation in creating them. And, as to all counts, the state and trial court agreed that the SD card's full contents were relevant to show Duncan's modus operandi, intent, absence of mistake, and propensity for voyeurism. Therefore, we cannot say that the jurors' exposure to evidence found on the SD card had no effect on their determination of Duncan's guilt as to all counts.

¶60        When, as here, the defendant has timely objected before the trial court to evidence that has been erroneously admitted, the state carries the burden of demonstrating that such evidence was harmless as to some or all of the counts. In its appellate briefing, the state has failed to make any argument that the erroneous admission of the SD card evidence would be harmless as to any count. Indeed, it does not mention the harmless error doctrine at all. *See Glissendorf*, 235 Ariz. 147, ¶ 23 (finding state failed to meet burden of establishing harmlessness when "answering brief before the court of appeals . . . did not even mention harmlessness"). Given the state's failure to discharge its burden, we must reverse the convictions and sentences on all counts and remand this case for a new trial. *See id.* ¶¶ 24, 26.

## Disposition

¶61        For the foregoing reasons, we reverse Duncan's convictions and sentences and remand for a new trial consistent with this opinion.